**CONTINENTAL OIL COMPANY, a corporation, Plaintiff in Error,**

**v.**

**H. E. RAPP, E. R. Rapp and R. E. Rapp, copartners, doing business as H. E. R. Drilling Company, Defendants in Error.**

No. 36950.

Supreme Court of Oklahoma.

May 22, 1956.

Rehearing Denied Sept. 12, 1956.

Cochran, Dudley, Fowler, Rucks, Baker & Jopling, Richard W. Fowler, Richard R. Linn, Oklahoma City, for plaintiff in error.

Embry, Crowe, Tolbert, Boxley & Johnson, John W. Swinford, Oklahoma City, for defendants in error.

HALLEY, Justice.

This action was filed December 11, 1953, in the District Court of Oklahoma County by H. E. Rapp and others, co-partners, doing business as H. E. R. Drilling Company, against Continental Oil Company. The parties will be referred to as "Rapps", "Continental", or as plaintiffs and defendant.

The Rapps alleged that it owned an undivided interest in certain oil and gas leases in Noble County, known as the Strom and Capers leases, and that prior to September 30, 1953, Continental had purchased oil from them from the Strom lease of the value of $857.85 and that prior to September 30, 1953, Continental had purchased oil from them produced from the Capers lease in the value of $3,138.11, making the Continental indebted to them as of September 30, 1953, in the sum of $3,995.96.

That on October 31, 1952, the Continental, through inadvertence and error credited the Rapps with the sum of $3,386.22, which sum is now due by the Rapps to Continental and that by reason of the erroneous credit Continental is entitled to deduct from the amount it owed plaintiffs the sum of $3,386.22, leaving a balance due plaintiffs by defendant the sum of $609.74, for which amount they prayed judgment against Continental.

Continental answered and filed a cross-petition alleging that there had been established the "Ceres Bartlesville Sand Unit" affecting certain oil and gas leases in Noble County and that Continental was appointed and is still acting as the Unit Operator; that the Rapps owned two producing oil and gas leases located within the Unit Area and became a member of the Unit and a qualified subscriber to the Plan of Unitization which provided in part:

"* * * the Operating Committee shall determine what part of the lease and other operating equipment * * * used in the operation of wells taken

over by the Unit it considers necessary or desirable to take over and use in connection with the unitized development and operation of the Unit Area, * * * (names derricks and other equipment) shall be delivered to and taken over by the Unit. All lease and operating equipment not so taken over shall remain the separate property of the several owners thereof and may be used by the said separate owners in the operation of wells producing from formations other than the Ceres Bartlesville Sand or reclaimed as such separate owners may desire. * * *"

It further provides for an accounting for all equipment taken over by the Unit from lessees within the Unit and proper charges and credits made so that each lessee thereafter will own an interest in all equipment so taken over by the Unit and that the Unit operators shall pay all expenses incurred in the development and operation of the Unit.

The Unit operator shall render to each lessee within the Unit a statement monthly of charges and credits for the preceding month. In the event any lessee fails to pay its share of the Unit expense when due any Unit lessee may take and market or purchase such production and credit it to the defaulting member.

Pursuant to the above provisions the Operating Committee caused an inventory to be taken of all lease and operating equipment used in the operations of the wells taken over by the Unit in order to determine what equipment was necessary or desirable to take over and use in connection with the operation of the Unit Area.

In this inventory was included a number of derricks, in eight of which the Rapps owned an undivided one-half interest. All of this equipment was appraised pursuant to the Plan of Unitization and such values placed opposite the various items.

In August, 1952, certain employees of the Continental accounting department, erroneously believing that the Unit had taken over for use all of the equipment listed in the inventory, adjusted the accounts of the various members of the Unit upon such erroneous basis and credited the account of the Rapps with a much larger amount than it was entitled to have, giving them a net credit of $8,455.53, when in fact the Rapps were then indebted to Continental as the Unit Operator.

Thereupon the accounting department of Continental, erroneously believing that the Rapps were entitled to be paid such credit, paid them the sum of $8,455.53.

On September 25, 1952, at the regular meeting of the Operating Committee of the Unit, it was decided that certain items in the inventory were not necessary for use in the operation of the Unit and rejected such items, including all derricks and other equipment in which the Rapps owned an interest. Accounts were readjusted as a result of this action by the Committee and the Rapps' account was charged with $11,503.

That the payment of $8,455.53 made to the Rapps by Continental in August, 1952, by mutual mistake resulted in unjustly enriching the Rapps in that amount. Such error, together with other indebtedness of the Rapps to Continental amounts to $10,954.01, due Continental by the Rapps, provided Continental is entitled to recover on its cross-petition.

It was alleged that the Rapps refused to pay the sum due Continental as above set out after demand was duly made. Continental prayed for judgment against the Rapps in the sum of $10,954.01, with interest from September, 1952, until paid. It was stipulated between the parties that after deducting the amount due by Continental to the Rapps for oil, the amount due Continental would be $10,954.01, should it be found that Continental was entitled to recover under its cross-petition.

The Rapps answered the cross-petition and alleged that in accordance with the Unit agreement the Operating Committee determined what equipment of Rapps would be retained by the Unit and that such selection was made by the inventory dated December 1, 1951, and forwarded to the

Rapps June 12, 1952. Also, that about June 30, 1952, the Rapps were paid by the Unit the sum of $7,734.71.

That in August, 1952, it agreed to sell its interest in the Unit, which sale was completed about December 1, 1952, without knowledge on its part that Continental claimed such payments as were made to the Rapps were made by mistake. That just prior to the completion of the sale of the Rapps' interest in the Unit, it caused inquiry to be made of Continental concerning the Rapps' accounts with the Unit and was advised that all operating expenses and other indebtedness were fully paid.

This action is clearly the result of a misunderstanding which arose because the accounting department of Continental assumed that all of the equipment listed in the original inventory prepared by the Operating Committee was to be retained by the Unit operator and used in the operation of the Unit. It was later decided by the Operating Committee that the derricks and other equipment were not needed in such operations and should be turned back to the original owners as of the date the Unit was created.

In the meantime Continental proceeded to give the Rapps credit for the equipment of the Rapps consisting largely of an interest in certain derricks and actually paid the Rapps for such equipment. Continental now asks to be reimbursed for such sums and acknowledges that the Rapps are entitled to credit for the sum of $609.74 for oil purchased by the Continental from them. The erroneous payment was made to the Rapps August 29, 1952, and on September 25, 1952, the Operating Committee decided that the derricks and certain other equipment belonging to the Rapps were not necessary operating equipment and rejected it as equipment to be retained by the Unit operator.

Continental contends that since the Operating Committee of the Unit never accepted the derricks but rejected them in September, 1952, as equipment not needed for Unit operations the Rapps are bound by such action of the Operating Committee as all other members of the Unit were bound by the actions of such committee which were within the scope of its authority.

The Plan of Operation of the Unit was executed by all members of the Unit and the "Effective Date" of the Unit was December 1, 1951. We agree that since the Operating Committee could not take an inventory of the property on the Unit until after December 1, 1951, because that was the date on which the Unit operator was to take possession and assume control of the Unit Area, the making of a complete inventory was necessary in order that the Operating Committee might know what equipment was available for it to consider in order to decide what was necessary and advisable for it to retain and what equipment should be rejected. We think it clear that the Operating Committee had the authority to accept and retain any equipment on the Unit Area on December 1, 1951, when it assumed possession of such equipment as was then on the Unit Area. A complete inventory was obviously necessary in order for the Operating Committee to carry out its functions of determining what should be retained and what should be rejected and turned back to the various lease owners.

The Operating Committee held four meetings. Only one was attended by a representative of the Rapps. At the fourth meeting on September 25, 1952, the first decision was made as to the acceptance and rejection of equipment. The Rapps received notice of such meeting and also a copy of the minutes of each meeting which appear in the case-made. They disclose that the Operating Committee took no action on the acceptance or rejection of equipment until the fourth meeting of the Committee. The record discloses no unreasonable delay in reaching its decision and it should be kept in mind that the Rapps could have made an effort to get the Operating Committee to act sooner than it did, but no such effort is shown.

The record clearly shows that the money paid by Continental to the Rapps

was the result of the accounting department of Continental in assuming erroneously that the Operating Committee had decided to use the equipment of the Rapps in operating the Unit. No such decision was ever made. On the other hand, it was decided by the Operating Committee that the Rapps' equipment involved would not be retained and used in the operation of the Unit. The money was paid to the Rapps under an erroneous belief that it was due when in fact it was not due.

The general rule applicable under such circumstances as are outlined above is stated in the comment note of 87 A.L.R. 649, as follows:

"The general rule as to the recovery of money paid under mistake of fact has been stated as follows: Where money is paid to another under the influence of a mistake of fact, that is, on the mistaken supposition of the existence of a specific fact which would entitle the other to the money, and the money would not have been paid if it had been known to the payer that the fact was otherwise, it may be recovered. The ground on which the rule rests is that money paid through misapprehension of facts, in equity and good conscience belongs to the person who paid it. 21 R.C.L. 164."

This Court adopted this rule in Epperson v. First State Bank of Ringling, 168 Okl. 171, 32 P.2d 283, and a full and able discussion of this rule is contained therein.

In the second paragraph of the syllabus in Rogers v. Lassiter, 196 Okl. 228, 164 P.2d 632, it is said:

"While the action for money had and received is a law action triable to a jury, its determination is controlled by principles of equity and fair dealing."

In Ryan v. Spaniol, 10 Cir., 193 F.2d 551, at page 553, it is said:

"Although an action for money had and received is one at law, it is in the nature of a suit in equity and is governed by equitable principles. It may be maintained when a person has in his possession money belonging to another which in equity and good conscience he ought to pay over to the claimant. The action is founded upon the principle that a person should not be unjustly enriched at the expense of another. * * *"

There were a total of eighteen derricks rejected by the Operating Committee as necessary equipment. The Rapps owned a one-half interest in eight of these derricks. The owners of the other ten and the owners of the other interest in the eight derricks involved apparently agreed to accept the rejection by the Operating Committee and the Rapps alone refused to recognize the decision and refuses to refund to Continental money paid to them by an admitted error.

We do not think the right of Continental to recover is barred by the doctrine of estoppel. The Rapps commenced negotiations to sell their interest in the Unit in September 1952, to Aurora Gasoline Company, being about the time the Rapps received the erroneous payments from Continental. This sale was only of their interest in the oil produced from the Unit and did not cover any of the equipment here involved. The sale was finally completed in the latter part of 1952, for the sum of $25,000 in cash, and $75,000 from one-half of Aurora's interest in Unit production. It is not shown that the Rapps suffered any monetary loss in the sale of their interest by reason of the demand by Continental to repay the money which it had erroneously paid to the Rapps.

Continental as Unit operator requested that the Rapps remove the derricks from off the wells. The value of the derricks at the time of trial was as great as in September, 1952. The elements of estoppel are set out in Antrim Lumber Co. v. Wagner, 175 Okl. 564, 54 P.2d 173, 174, as follows:

" 'First. There must be a false representation or concealment of facts.

" 'Second. It must have been made with knowledge, actual or constructive, of the real facts.

" 'Third. The party to whom it was made must have been without knowledge, or the means of knowledge, of the real facts.

" 'Fourth. It must have been made with the intention that it should be acted upon.

" 'Fifth. The party to whom it was made must have relied on or acted upon it to his prejudice.' "

In the later case of Mattson v. Fezler, 202 Okl. 589, 216 P.2d 275, it is said in the third paragraph of the syllabus:

"In order to create an estoppel in pais, the party pleading it must have been misled to his injury; that is, he must have suffered a loss of a substantial character, or have been induced to alter his position for the worse in some material respect."

The Rapps had the identical means of knowledge of the facts as Continental had. Both should have known that the Operating Committee had not accepted the derricks for use in the operation of the Unit when payment was made therefor by Continental to the Rapps.

There is no evidence that the error of Continental affected the sale price of the interest of the Rapps in production, and they have failed to establish equitable estoppel because the facts fail to show any loss on the part of the Rapps and no gain to Continental by reason of the erroneous payments above mentioned.

Since it was stipulated that the Continental owed the Rapps $609.74 for oil purchased and that if Continental was entitled to recover for making erroneous payments it should receive judgment for $10,954.01, after deducting amount due the Rapps for oil purchased in the sum of $609.74, we are of the opinion that the trial court erred in rendering judgment for the Rapps and such judgment is reversed with directions to enter judgment for Continental for the amount above named.

JOHNSON, C. J., WILLIAMS, V. C. J., and CORN, DAVISON and JACKSON, JJ., concur.

BLACKBIRD, J., dissents.