J. A. HUMPHREY, G. E. Hall, A. Pollard Simons and William D. McBee, Plaintiffs,

v.

PLACID OIL COMPANY, Defendant.
Civ. A. No. 1135.

United States District Court
E. D. Texas, Sherman Division.
May 29, 1956.

Lanham Croley (of Golden, Croley, Howell, Johnson & Mizell), Dallas, Tex., for plaintiffs, J. A. Humphrey and G. E. Hall.

Bascom Thomas (of Bowyer, Gray, Thomas, Crozier & Harris), Dallas, Tex., for plaintiff, A. Pollard Simons.

Fred G. Gannon, Dallas, Tex., for plaintiff, William D. McBee.

Ralph B. Shank (of Shank, Dedman & Payne), Dallas, Tex., for defendant, Placid Oil Co.

SHEEHY, Chief Judge.

This is an action by the plaintiffs, each of whom is a resident and citizen of the State of Texas, to recover from the defendant, a Delaware corporation, damages in the sum of $25,000 for alleged breach of contract or in the alternative to recover in quantum meruit the reasonable value of their services which plaintiffs allege is the sum of $25,000, which action grows out of a dry hole contribution letter agreement dated April 8, 1955, executed by the defendant and accepted by the plaintiffs' assignors.

The pertinent facts are found to be as hereinafter stated.

In the early part of April, 1955, Alex Hickey and H. R. Randall were contemplating drilling a test well for oil or gas in the southwest quarter of the I. Abraham Survey in Grayson County, Texas. This well was to be what is commonly referred to as a wildcat well. At that time Placid Oil Company owned oil and gas leases covering four tracts of land in the immediate area of the I. Abraham Survey, two of which tracts were contiguous to the I. Abraham Survey. The Shell Oil Company and Midwest Oil Corporation each owned oil and gas leases covering lands in the immediate area of the I. Abraham Survey. As is often done in the oil business, Hickey and Randall sought financial assistance in the drilling of the test well from other owners of oil and gas leases covering lands in the area in which the test well was to be drilled. The defendant, Placid Oil Company, gave to Hickey and Randall what is commonly referred to as a dry hole contribution letter. This letter, which

hereinafter will be referred to as the dry hole letter, is dated April 8, 1955, and was accepted by Hickey and Randall on April 12, 1955. The body of the letter is set out in Appendix A attached hereto and made a part hereof. Similar dry hole letters were obtained by Hickey and Randall from Midwest Oil Corporation and Shell Oil Company under the terms of which Midwest Oil Corporation was to make a dry hole contribution of $1,000 and Shell Oil Company was to make a dry hole contribution of $10,000. The test well could not have been drilled without the agreement of defendant to make the dry hole contribution in the sum of $25,000 and defendant was so advised by Hickey and Randall before it agreed to make the dry hole contribution in the sum of $25,000. After having first obtained the written consent of the defendant so to do, Hickey and Randall assigned all of their right, title and interest in and to the dry hole letters, including the dry hole letter of the defendant, to the plaintiffs, and thereafter the plaintiffs undertook the drilling of the test well referred to in the dry hole letters which is known as the S. A. Johnson No. 1 well. The well was commenced on April 28, 1955, and the plaintiffs continued the drilling of same until a depth of 10,025 feet was reached on July 27, 1955, at which time certain electrical logs or surveys of the well down to the 10,025 foot depth were made. The Oil Creek Sand of Ordivician Age was not encountered or reached at or prior to the 10,025 foot depth. At all times during the drilling of the well to the 10,025 foot depth defendant's representatives had free access to the derrick floor and were given all information concerning the drilling of the well, including daily drilling reports, samples of all cuttings and cores obtained in the drilling operations and copies of all electrical logs or surveys. During the process of drilling to the 10,025 foot depth the plaintiffs caused several drill stem tests to be made of certain formations or horizons in which there was either a showing of oil or the presence of oil

sand. The first drill stem test was attempted on July 6, 1955, when a depth of 8,380 feet had been reached. Plaintiffs gave the defendant notice that this test was to be made, and the defendant had its geologist present at the well when the test was made. However, at the time plaintiffs notified defendant of the fact that such test was to be made defendant advised plaintiffs that it would not be necessary, in the future, to give advance notice to defendant of further drill stem tests. The first drill stem test was an effort to test the formation between 8,258 feet and 8,380 feet. Because of a packer failure this drill stem test was not successful. On July 8, 1955, when the well had been drilled to a depth of 8,422 feet, a second drill stem test was made testing the formation or formations between 8,255 feet and 8,422 feet. There was no failure of this test, and the results of the test were promptly transmitted to the defendant. On July 11 and 12 when the well had been drilled to a depth of 8,606 feet, a drill stem test was made of the formation or formations between 8,571 feet and 8,606 feet. The results of this test were promptly furnished to the defendant. On July 19 and 20, 1955, when the well had been drilled to a total depth of 9,270 feet, the plaintiffs made a drill stem test of the formation or formations between 9,202 feet and 9,270 feet. The results of this test were promptly furnished the defendant.

When the electrical logs or surveys of the well were made on July 27, 1955, as aforesaid, defendant's geologist was present and defendant was furnished with true and correct copies of said electrical logs or surveys.

On July 27, 1955, after obtaining the information shown by the electrical logs or surveys above mentioned, plaintiffs considered that information, together with the results of the drill stem tests that were made during the course of drilling and the samples of the various cuttings and cores obtained throughout the drilling operation and after obtaining the advice and opinions of their geologists and a petroleum engineer, con-

cluded that the well down to the 10,025 foot depth was a dry hole, i. e., it was not capable of producing oil or gas in paying quantities. Subsequent to reaching that conclusion and on the same date plaintiffs contacted defendant's representatives in defendant's office in Shreveport, Louisiana, and advised defendant's said representatives of its conclusions as to the well being a dry hole and made inquiry of defendant's representatives with reference to defendant's attitude as to making payment of the $25,000 provided for in its dry hole letter. Defendant's representatives contacted by plaintiffs advised plaintiffs that the defendant's decision in the matter would await the return of defendant's President, Mr. Dalton, to Shreveport on July 28, 1955. On the afternoon of July 28, 1955, defendant sent to plaintiffs the following telegram:

> "Reference Made To Dry Hole Contribution Agreement Of April 8, 1955, Under Which S A Johnson # 1 Is Drilling. You Are Obligated To Properly Test All Horizons In Well Which Appear Promising Of Producing Oil Or Gas. To Do So You Must Set Pipe And Conduct Tests By Perforating And Sandfracing The Following Zones: 8142–8160; 8176–8190; 8240–8300; 8390–8450; 8570–8676; 8832–8870; 8955–8992; And 9200–9350. We Request That Well Be Properly Tested As Herein Provided, Th[e] Failure Of Which Will Be A Material Breach Of Agreement And A Forfeiture Of All Your Rights Under Same."

This telegram was received by plaintiffs in Dallas, Texas, at approximately 5 o'clock p. m. on July 28. The telegram was confirmed by defendant in a letter to plaintiffs dated July 28, 1955. From the time the plaintiffs completed the making of the electrical logs or surveys of the well on July 27 until defendant's telegram, above mentioned, was received

on the afternoon of July 28 all operations at the well were shut down. Plaintiffs, upon receiving defendant's said telegram, treated same as an anticipatory breach or repudiation on the part of the defendant of the dry hole letter agreement in question. Considering that defendant had breached or repudiated said dry hole letter agreement plaintiffs decided to drill the well deeper and drilling operations were resumed. The well was then drilled to a depth of 10,250 feet. Upon that depth being reached additional electrical logs or surveys were run. These last mentioned electrical logs or surveys showed the formation between 10,028 feet and 10,060 feet to be promising of producing oil in paying quantities. As a result of that information plaintiffs proceeded to set pipe in the well, to perforate the pipe at the depth from 10,028 to 10,060 feet and to sandfrac.[1] Upon the completion of this last mentioned operation the plaintiffs were able to and did complete the well as a producing well on or about August 1, 1955, with production being from a formation or formations below 10,025 feet. The well has never been plugged and is still producing oil, however, the production has consistently declined each month. In September, 1955, the first month of production from the well, 1,403.96 barrels of oil were produced. Each month thereafter the production became less. In January, 1956, the production was down to 525.82 barrels and the evidence does not show the exact production for any month after January, 1956.

Up to the time plaintiffs received defendant's telegram, above quoted, plaintiffs had allowed defendant's agents or representatives full access to the derrick floor of the drilling rig and had furnished to defendant all information relative to said well and the drilling thereof available to plaintiffs as required by defendant's dry hole agreement in question.

---

1. Sandfracing is an operation designed to loosen or break up tight formations which contain oil, thus causing said formations to have more permeability and resulting capability of producing oil.

By registered letter dated August 5, 1955, the defendant advised plaintiffs in part as follows:

"Under the Dry Hole Contribution Letter Agreement of April 8, 1955, which was accepted by you on April 12, 1955, the consideration to us, for our agreement therein contained, was the furnishing to us the information and material set forth in said agreement.

"Our duly authorized representative, Mr. Charles Williams, who has been present at the location of operations, has requested and demanded such information and material in accordance with the agreement and you have denied and have consistently denied him such information and material and have refused and failed to send said information to us at the above address, so please be advised that this letter is notice to you of our termination of said agreement and all rights you once had under same."

By letter dated August 25, 1955, addressed to the defendant plaintiffs, acting through their attorneys, made demand on defendant for the payment of the sum of $25,000, the amount the defendant had agreed to pay plaintiffs in its dry hole contribution letter. By letter dated August 26, 1955, addressed to plaintiffs' attorneys and in reply to plaintiffs' said letter of August 25, defendant refused to pay said sum of $25,-000 and advised plaintiffs in part as follows:

"Since your clients breached the agreement by failing to supply the necessary information, we terminated same as of August 5, 1955, which relieves us of any obligations under said agreement; therefore, we specifically deny any obligation that we owe your clients the sum of $25,000.00"

The actual drilling of the well in question was performed on behalf of plaintiffs by M. J. DeLaney Company of Dallas, Texas, and the said M. J. DeLaney Company acted for and on behalf of plaintiffs in the drilling of the well and in the furnishing of the information relative to the drilling of the well to those entitled thereto, including defendant. At the outset of the drilling operations there was set up in the office of M. J. DeLaney Company a list of those entitled to receive the information relative to the well and the drilling thereof, and included on this list, among others, was the defendant. On or about September 15, 1955, when distribution of certified copies of the driller's log on the well in question was being made to those entitled to receive information as to the drilling of said well, a secretary in the office of M. J. DeLaney Company by letter of transmittal dated September 15, 1955, sent to defendant a certified copy of the driller's log on the well in question.

In drilling the Johnson well to the 10,025 foot depth and in making the electrical logs or surveys that were made on August 27, 1955, the plaintiffs expended approximately $121,000. If plaintiffs had plugged the well at the 10,025 foot depth, the cost to them of the plugging operation would have been $2,000. The cost to plaintiffs of testing the formation or zones mentioned in defendant's telegram, above quoted, in the manner requested by defendant in said telegram would have been approximately $75,000, exclusive of any cost for casing and tubing.

Subsequent to the completion of the Johnson well the defendant drilled a well on a tract of land east of and adjacent to the I. Abraham Survey on which it had an oil and gas lease, the primary term of which was expiring in May, 1956. This well was known as the J. H. Lawrence No. 1 well and was located approximately one-quarter of a mile almost due east of the Johnson well. Defendant started the drilling of the Lawrence well on or about September 13, 1955, and drilled same to a depth of approximately 10,435 feet, which depth was reached in the early part of November, 1955. The Lawrence well was com-

pleted as a producer of oil in a zone or formation deeper than the zone or formation in which the Johnson well was completed as a producer. Defendant in the drilling of the Lawrence well did not make a drill stem test or any other test of any zone or formation above 10,025 feet and did not set pipe and test any zone or formation above 10,025 feet by perforating the pipe and sandfracing. When the Lawrence well reached the total depth of approximately 10,435 feet, the defendant did set pipe and test the zone or formation from which the Lawrence well is now producing by perforating the pipe in that zone or formation and sandfracing.

The plaintiffs contend that the defendant's telegram of July 28, 1955, constituted an anticipatory breach or renunciation of the dry hole letter agreement in question, which they elected to accept and treat as such, thereby relieving them from any further performance, and because of said breach or renunciation plaintiffs have been damaged in the sum of $25,000 which they are entitled to recover herein. In the alternative plaintiffs contend that, even if defendant's said telegram did not constitute an anticipatory breach or renunciation of the dry hole letter agreement and plaintiffs breached said contract, plaintiffs are entitled to recover in quantum meruit the reasonable value of the services they rendered defendant in the furnishing to defendant of the information relative to said well and the drilling thereof that they did furnish defendant which reasonable value they alleged to be the sum of $25,000. The defendant denies that it was guilty of any anticipatory breach or renunciation of the dry hole letter agreement and further contends that if

its telegram and letter dated July 28, 1955, constituted an anticipatory breach or renunciation of the dry hole letter agreement, plaintiffs waived any such anticipatory breach or renunciation by its conduct subsequent to July 28, 1955, in demanding payment from defendant of the $25,000 as they did in the letter of their attorneys to defendant dated August 25, 1955, above referred to, and by furnishing defendant with a certified copy of the driller's log on the well in question on or about September 15, 1955. The defendant also denies that the plaintiffs are entitled to recover on a quantum meruit basis.

The doctrine of allowing a recovery for an anticipatory breach of a contract is recognized in Texas.[2] The repudiation of a contract by one of the parties to it before the time of performance by the repudiating party has arrived amounts to a tender of breach of the entire contract, and, if it is accepted by the other party, it constitutes what is known in law as an anticipatory breach of such contract as a whole, and in such event the injured party is at liberty to treat the contract as terminated and to at once demand his damages for such breach.[3] In order for there to be such a repudiation of a contract the declaration of an intention not to perform the contract in the future must be positive and unconditional in its terms.[4] Such an anticipatory breach or repudiation has been committed when one party to the contract demands of the other a performance to which he has no right under the contract and states definitely that unless his demand is complied with he will not render his promised performance.[5]

2. Pollack v. Pollack, Tex.Com.App., 46 S.W.2d 292; Englehart v. Volunteer State Life Ins. Co., Tex.Civ.App., 195 S.W.2d 798 (Writ of Error Refused)

3. Greenwall Theatrical Circuit Co. v. Markowitz, 97 Tex. 479, 79 S.W. 1069, 65 L.R.A. 302; Moore v. Jenkins, 109 Tex. 461, 211 S.W. 975; and Pollack v. Pollack, supra.

4. Moore v. Jenkins, supra; and Kilgore v. Northwest Texas Baptist Educational Ass'n, 90 Tex. 139, 37 S.W. 598.

5. L. G. Balfour Co. v. Brown, Tex.Civ. App., 110 S.W.2d 104, 107; Swift & Co. v. Continental Oil & Cotton Co., Tex. Civ.App., 170 S.W. 114 (Writ of Error Refused); Jordan v. Madsen, 252 P. 570; and Corbin, Contracts, Vol. 4, Sec. 973.

In order to determine whether defendant's telegram of July 28 constitutes an anticipatory breach or repudiation of the dry hole letter agreement we must look to the purposes of the dry hole letter agreement and the rights and obligations of the respective parties thereunder. The dry hole letter agreement is a type of contract that could be referred to as an information contract and is quite common in the business of exploring for and producing oil and gas. It is the type of contract under which one who drills a test well on a lease in which he is interested receives financial assistance by way of contributions from an owner or owners of adjoining land or oil or gas leases covering adjoining or nearby lands. The object of the party to the contract who is the contributor is to secure the benefit of information to be derived from the drilling of a test well near his holdings in order that he might act prudently in future expenditures in the development of his holdings for oil and gas. Prior to and at the inception of the dry hole letter agreement plaintiffs' assignors were desirous of drilling the Johnson well on lands in which they owned an interest in the oil and gas but in order to drill such well they were going to have to have financial assistance in the event the well was a dry hole. The defendant, as the owner of oil and gas leases covering four tracts of land in the general area of the Johnson well, two of which tracts were adjacent to the tract of land upon which the Johnson well was to be drilled, realized the value to them of the information that would be received if the Johnson well were drilled to either a given depth or to a certain formation or zone. It was under these circumstances that defendant and plaintiffs' assignors entered into the dry hole letter agreement.

The only performance required of defendant by the dry hole letter was the payment by defendant to plaintiffs of the sum of $25,000 when the plaintiffs had performed those performances required of them by the dry hole letter. At the time plaintiffs' representatives contacted defendant's representatives on July 27, 1955, after defendant had been furnished with copies of the electrical logs or surveys made of said well that day to the 10,025 foot depth, the plaintiffs had drilled the well to the total depth required by the dry hole letter, i. e., they had drilled the well to a depth slightly in excess of 10,000 feet without having encountered Oil Creek Sand of Ordivician Age, and at that time the plaintiffs had fully complied with all the terms and provisions of the dry hole letter with the exception of furnishing defendant with a certified copy of the driller's log, abandoning and plugging the well as a dry hole and furnishing defendant with a plugging report evidencing the plugging of the well in accordance with the law of the State of Texas and the testing of the horizons or zones mentioned in defendant's telegram of July 28 in the manner requested by defendant in said telegram, provided plaintiffs under the dry hole letter were required to test said horizons or zones in the manner requested by defendant. All the information that would be contained in a copy of the driller's log had been furnished defendant through the daily drilling reports previously furnished defendant by the plaintiffs. When plaintiffs contacted defendant's representatives on July 27, as aforesaid, they did not request or demand of defendant that the defendant immediately pay the sum of $25,000. The effect of the statements made by plaintiffs' representatives to defendant's representatives on that occasion was to advise the defendant's representatives that the plaintiffs had concluded that the well to the 10,025 foot depth was a dry hole and to make inquiry of the defendant as to their attitude in that respect to the end that if defendant concurred in the opinion that the well was a dry hole and the well were plugged and abandoned at that depth, the defendant would make payment of the sum of $25,000. Plaintiffs did not at that time indicate to the defendant that they would not abandon and plug the well and furnish

defendant with a plugging report evidencing the plugging of the well in accordance with the law of the State of Texas and would not furnish defendant with a certified copy of the driller's log, and defendant did not believe or understand from that conversation with plaintiffs' representative that plaintiffs would not abandon and plug the well and would not furnish defendant with a copy of the plugging report and a copy of the driller's log.

Did defendant's telegram of July 28, above quoted, considered in the light of all attending circumstances, above mentioned, constitute an anticipatory breach or renunciation of the dry hole letter agreement by defendant? Although the telegram might be said to be couched in terms of a request, it is in effect a positive unconditional statement on the part of the defendant that it would not perform the contract by making payment to plaintiffs of the sum of $25,000 unless the plaintiffs set pipe and tested the zones or horizons mentioned in said telegram by perforating the pipe and sand-fracing. If the plaintiffs were not required by the dry hole letter agreement to test such zones and horizons in such manner, defendant's said telegram was an arbitrary and unreasonable demand of a performance on the part of plaintiffs which plaintiffs had not contracted to perform and clearly constituted an anticipatory breach or renunciation of the dry hole letter agreement by the defendant. The only type of test specifically mentioned in the dry hole letter agreement is the drill stem test, several of which the plaintiffs made in the process of drilling as above pointed out.

In order to determine whether plaintiffs were under the duty to test the zones or horizons mentioned in the telegram in question in the manner set out in the telegram an examination of the seventh paragraph of the dry hole letter must be made. Under the provisions of that paragraph the plaintiffs were under the duty to properly test any horizon or formation when an electrical formation survey is made, either before or after contract depth, and the information from such survey considered by itself or in conjunction with other indications or evidence from cuttings, cores or showings makes the formation appear promising of producing oil or gas in paying quantities, provided the plaintiffs had not previously tested any such formation. Did the electrical logs or surveys made on July 27, 1955, above referred to, either by themselves or in conjunction with other indications or evidence from cuttings, cores or showings made or encountered during the drilling of the well to the 10,025 foot depth make the formation or zones mentioned in defendant's said telegram or any of them promising of producing oil or gas in paying quantities? In order to answer that question the meaning of the phrase "makes the formation appear promising of producing oil or gas in paying quantities" as used in the seventh paragraph of the dry hole letter must be determined. The word "makes" is defined in Webster's New International Dictionary, Second Edition, Unabridged, under Note 21 as meaning "to cause; to constrain or compel." In the same dictionary "promising" is defined as meaning "full of promise; likely," and the word "likely" is defined as meaning "of such a nature or so circumstanced as to render something probable." Neither party has cited a case from Texas or elsewhere wherein the term "paying quantities" as used in a dry hole contribution agreement similar to the one here in question was construed and I have been unable to find any such case. The Supreme Court of Texas in Garcia v. King, 139 Tex. 578, 164 S.W.2d 509, in construing the habendum clause of an oil and gas lease under the terms of which the lease was extended "and so long thereafter as oil, gas, or other minerals is produced from said land," held that the term "produced" meant "produced in paying quantities" and that "paying quantities" meant that the production be sufficient under normal conditions that lessee could realize a profit over and above current operating cost after deducting les-

sor's royalty. In actions to cancel an oil and gas lease on the ground that the lessee has failed to develop the lease under his implied covenant to develop, the Courts of Texas have held that there must be a reasonable expectation that oil or gas can be produced in paying quantities and by "paying quantities" as used in that respect is meant that it must reasonably appear that oil or gas can be produced in such quantities as to pay the cost of development and production and afford a reasonable profit to lessee.[6] The term "paying quantities" as used in the provisions of an oil and gas lease to the effect that the lessee must drill to a certain depth unless oil or gas be encountered in paying quantities above that depth has been construed to mean such quantities of oil or gas that an ordinarily prudent person experienced in oil or gas production, would, taking into consideration the surrounding circumstances and conditions, expect a reasonable profit over and above the entire cost of drilling, equipping and operating the well so drilled.[7]

It is noted that the court in the Garcia Case, supra, did not include the cost of drilling or development in the definition of "paying quantities." That is readily understandable because the purpose of that part of the habendum clause of the oil and gas lease construed by the court in that case had for its purpose the extension of an oil and gas lease beyond its primary term because of the production of oil or gas from said land at the time of the expiration of the primary term. Under those circumstances the cost of drilling or development is not entitled to consideration as the well had already been drilled and that cost incurred. The proper and only inquiry under those circumstances was whether oil or gas was being produced at or after the expiration of the primary term in sufficient quantity that it would be profitable for the lessee to continue producing the well.

Considering the objects of the dry hole letter, both from the standpoint of the plaintiffs and from the standpoint of the defendant, I am of the opinion and so conclude that "paying quantities" as used in the dry hole letter agreement in question means such quantities of oil or gas that an ordinarily prudent person experienced in oil or gas production, would, taking into consideration the circumstances and conditions then existing, expect a reasonable profit over and above the cost of drilling, equipping and operating the well. In view of that conclusion and the definitions of "makes" and "promising," above pointed out, it follows that the phrase "makes the formation appear promising of producing oil or gas in paying quantities" as used in the dry hole letter means "to cause the formation to appear reasonably probable of producing oil or gas in such quantities that an ordinarily prudent person experienced in oil or gas production, would, taking into consideration the existing conditions and circumstances, expect a reasonable profit over and above the cost of drilling, equipping and operating the well."

Whether in defining the term "paying quantities" as used in the dry hole letter the element of cost of drilling or development should be included or whether only cost of production should be considered is not too material to the decision of this case because I find from the evidence that the electrical logs or surveys made of the well in question on July 27, 1955, considered by themselves or in conjunction with other indications or evidence from cuttings, cores, showings or drill stem tests did not make any formation, zone, or horizon down to the 10,025 foot depth, including the zones

6. Fort Worth National Bank v. McLean, Tex.Civ.App., 245 S.W.2d 309 (Writ of Error Refused NRE); and Magnolia Petroleum Company v. Page, Tex.Civ. App., 141 S.W.2d 691 (Writ of Error Refused).

7. Wolf Creek Oil Co. v. Turman Oil Co., 148 Kan. 414, 83 P.2d 136; and Riedman v. Barkwill, 139 Cal.App. 564, 34 P. 2d 744.

or horizons mentioned in defendant's telegram of July 28, appear reasonably probable of producing oil or gas in such quantities that an ordinarily prudent person experienced in oil or gas production would, taking into consideration the existing conditions and circumstances, expect a reasonable profit over and above current operating cost.

■ In view of the finding last mentioned, it is apparent that the plaintiffs were under no duty to make the test of the zones, or any of them, referred to in defendant's telegram of July 28, in the manner therein requested or in any other manner but in order that there might be a decision on all issues raised in this case I will take up the question as to the meaning of "properly test" as used in the seventh paragraph of the dry hole letter and plaintiffs' duty or responsibility in that respect. Neither party has cited any case construing the term "properly test" but to me that term could have only one meaning and that is the making of such test or tests in such manner as an ordinarily prudent operator would have made under the same or similar circumstances. In applying that meaning to the term "properly test" I find that an ordinarily prudent operator would not have tested the zones referred to in defendant's telegram of July 28, or any of them, in the manner defendant in said telegram requested the plaintiffs to test said zones.

Under the findings and conclusions above made, I have reached the inevitable conclusion that defendant's telegram of July 28 constituted an anticipatory breach or repudiation of the dry hole letter agreement. That being true, plaintiffs, under the authorities hereinabove cited, had the right to accept such repudiation as final and to treat the contract as terminated with no duty being on them to perform further under the contract. This, the plaintiffs did. Within a very short time after plaintiffs received defendant's telegram in question and after seeking the advice of their at-torneys the plaintiffs concluded that said telegram constituted an anticipatory breach or renunciation on the part of the defendant of the dry hole letter agreement and they accepted it as such a breach or renunciation. Under these circumstances plaintiffs, considering the dry hole letter agreement no longer in force, decided to resume drilling operations and to drill the Johnson well deeper in an effort to find oil or gas in paying quantities. Drilling operations were resumed in the late afternoon of July 28, 1955, and continued until the depth of 10,250 feet was reached on or about August 1, 1955. At all times subsequent to the resumption of drilling on the afternoon of July 28 the plaintiffs refused defendant and its representatives access to the derrick floor and refused to and did not furnish defendant with any information, samples, cuttings, cores or reports, including copies of electrical logs or surveys made of the well subsequent to July 28, relative to said well and the drilling thereof except a certified copy of the driller's log that was furnished defendant on or about September 15, 1955, as above mentioned. Plaintiffs, having promptly elected to accept the anticipatory breach or renunciation, continued at all times subsequent thereto to treat said contract as terminated and never at any time waived such breach or renunciation.

■■ The damages to which plaintiffs are entitled because of said anticipatory breach or repudiation of the dry hole letter agreement are to be determined as of the date of the breach or repudiation, but such damages are to be full compensation for the loss occasioned by depriving plaintiffs of the benefit of the contract.[8] Since the injury is to the contract as a whole, the measure of damages is the value of the thing injured or destroyed regarded as an article or property.[9]

■ Under the findings hereinabove made, the plaintiffs, at the time the well reached the 10,025 foot depth and the

---

8. Pollack v. Pollack, supra.

9. Pollack v. Pollack, supra.

electrical logs or surveys of July 27 had been made, had fully complied with their obligations under the dry hole letter agreement with the exception of plugging the well and furnishing defendant with a copy of the plugging report and a certified copy of the driller's log. Had the well been plugged at that time the defendant would have been obligated to pay the plaintiffs the sum of $25,000 upon being furnished a copy of the plugging report and a certified copy of the driller's log. The cost of plugging the well, which cost the plaintiffs did not incur, would have been the sum of $2,000. The plugging report could not have been of value to the defendant and, as above set out, all the information that would have been contained in the driller's log was previously furnished the defendant by plaintiffs in the daily drilling reports. In light of those facts I find that by reason of the anticipatory breach and renunciation of the dry hole letter agreement on the part of the defendant, plaintiffs have been damaged in the sum of $23,000.

As above indicated, plaintiffs alternatively to their cause of action for breach of contract seek to recover herein in quantum meruit the value of the services rendered by them to the defendant and accepted by the defendant in connection with the drilling of the test well in question. The services rendered by plaintiffs to the defendant under the dry hole letter agreement were the various types of information furnished by plaintiffs to the defendant during the course of the drilling of the well in question up to the time plaintiffs received defendant's telegram of July 28 as hereinabove set out.

 Texas recognizes the doctrine that one who has but partially performed a contract and is himself guilty of a breach of the contract may recover on quantum meruit the reasonable value of the services rendered and knowingly accepted by the other party subject to the right of the other party to recoup or reconvene his damages for the breach of the contract.[10] The amount that may be recovered under this doctrine may not exceed the contract price.[11]

 Although I am of the opinion that plaintiffs' recovery herein should be on their cause of action for breach of contract, I will nevertheless make a finding as to the reasonable value of the information that was furnished defendant by the plaintiffs to the end that if an appeal is taken from the judgment entered herein and on said appeal it is determined that plaintiffs are not entitled to recover on their cause of action for breach of contract as herein concluded but that plaintiffs are entitled to recover on their action in quantum meruit, the appellate court will have before it a finding of fact as to the reasonable value of said information furnished defendant by plaintiffs.

Unquestionably, the type of information obtained and furnished by plaintiffs to defendant and accepted in connection with the drilling of the well had a definite value to the defendant and the courts have so recognized.[12] By the dry hole letter agreement the parties thereto contemplated the drilling of the well to a depth of 10,000 feet or to a depth sufficient to test the Oil Creek Sand of Ordivician Age provided the last mentioned depth was reached before the 10,000 foot depth. The undisputed evidence shows that the Oil Creek Sand of Ordivician Age had not been encountered to the 10,025 foot depth. Obviously, the defendant at the time it entered into the dry hole letter agreement believed that the information it would receive from plaintiffs down to the 10,000 foot depth

10. City of Sherman v. Connor, 88 Tex. 35, 29 S.W. 1053; Colbert v. Dallas Joint Stock Land Bank, Tex.Com.App., 129 Tex. 235, 102 S.W.2d 1031; and 10 Tex.Jur., Sec. 235, pp. 411 and 413.

11. Colbert v. Dallas Joint Stock Land Bank, supra.

12. Hoffer Oil Corporation v. Carpenter, 10 Cir., 34 F.2d 589; and Atlantic Oil Producing Co. v. Masterson, 5 Cir., 30 F.2d 481.

would be worth $25,000 to it because that is the amount it agreed to pay for such information. Therefore, I find that the reasonable value of the information plaintiffs furnished defendant in connection with the drilling of the Johnson well, as above pointed out, and accepted by the defendant is the sum of $25,000.

Judgment will be entered herein in favor of the plaintiffs on their action for breach of contract, and that judgment will be to the effect that plaintiffs, jointly, recover of and from the defendant the sum of $23,000, together with all costs of Court incurred herein.

This Memorandum Decision shall constitute the Findings of Fact and Conclusions of Law herein as authorized by Rule 52, Fed.Rules Civ.Proc., 28 U.S. C.A.

### Appendix A.

"When accepted by you this letter will constitute our agreement regarding the drilling by you of a test well for oil or gas in Grayson County, Texas, and our dry hole contribution in support of the well.

"The well shall be located 660 feet from the South line and 660 feet from the West line of I. Abraham Survey, A–1578, being the Northeast Quarter (NE¼) of Section 8, University Leagues 1, 11, 15 and 16, Grayson County, Texas.

"Operations for the drilling of said well shall be commenced on or before thirty (30) days from the date hereof and shall be prosecuted thereafter with due diligence and in a good and workmanlike manner until one of the following depths is reached:

"(a) A depth which, in the opinion of our geologist, is sufficient to test the Oil Creek Sand of Ordivician Age, or

"(b) A total depth of 10,000 feet; whichever is the lesser depth.

"In the event that said well is abandoned as a dry hole after reaching either of the depths set out above and provided that you have complied with all of the terms and conditions of this letter, then in that event and only in that event, we will pay you jointly as a dry hole contribution the sum of $25,000.00.

"At all times during the drilling, testing and completing of said well (regardless of depth actually drilled and even though you should elect to forfeit the dry hole contribution by failing to perform fully the conditions of this letter), our agents or representatives shall have access to the derrick floor and shall be entitled to receive all information during such operations the same as though we were drilling the well; and specifically, but not limited to, we shall be furnished:

"(1) Daily drilling reports:

"(2) Samples of all cuttings and cores obtained in said drilling operations unless we elect not to take same;

"(3) Certified copy of driller's log;

"(4) True copy of an electrical formation survey from the base of the surface casing to total depth;

"(5) Complete information on drill stem tests made during drilling or after completion of drilling;

"(6) Sufficient notice of the taking of any cores or of the making of any tests for us to have a representative present to witness the operation if we so desire; and

"(7) Completion and plugging report evidencing the plugging of the well in accordance with the law of the State of Texas if said well results in a dry hole.

"After location of the above well has been staked and prior to the spudding in of the well you shall furnish us with a plat of the location of the well.

"When an electrical formation survey is made, either before or after contract depth, and the formation from such survey considered by itself or in conjunction with other indications or evidence from cuttings, cores or showings makes the formation appear promising of producing oil or gas in paying quantities, you

shall properly test such horizon if you have not previously tested it in this well.

"The agreement evidenced by this letter shall not be construed as creating a partnership or joint venture between us as the well is to be drilled at your sole cost, risk and expense.

"Neither this letter nor any rights hereunder may be assigned by you to any person or firm without our written consent.

"All notices required hereunder shall be given to our office at 418 Market Street, Shreveport, Louisiana, Telephone 4–2691.

"It is understood and agreed by all parties hereto that this letter supersedes and takes the place of a prior letter agreement dated April 5, 1955, addressed to M. E. Wainright, 601 Gulf States Building, Dallas, Texas, and M. E. Wainright joins herein to acknowledge the fact that the letter of April 5, 1955, is of no further force and effect.

"If the foregoing is in keeping with your understanding of our agreement, please execute the original and one copy of this letter in the space provided below and return the fully executed copy to us within fifteen (15) days from the date hereof."