**SLATS HONEYMON DRILLING COMPANY, a corporation, Plaintiff,**

**v.**

**UNION OIL COMPANY OF CALIFORNIA, a corporation, Defendant.**

**Civ. No. 63–92.**

United States District Court
W. D. Oklahoma.
March 17, 1965.

Bert Barefoot, Jr., Barefoot & Moler, Oklahoma City, Okl., for plaintiff.

H. B. Watson, Jr., Watson & Morley, Tulsa, Okl., for defendant.

DAUGHERTY, District Judge.

This is an action on an Acreage and Dry Hole Contribution Agreement entered into between the plaintiff and the defendant on December 22, 1960, and specifically involves the dry hole contribution provisions of said agreement.

In connection with this agreement the plaintiff drilled a well in Kingfisher County, Oklahoma, known as the Wrobbel-Geis No. 1, having commenced the well on or about March 3, 1961, within the prescribed time as extended, and the drilling operation having been completed on or about May 9, 1961. By letter dated August 21, 1962, the plaintiff made demand of the defendant for dry hole money in the amount of $17,900.00 pursuant to the aforementioned agreement.

The provisions of the said agreement pertinent to this litigation provide:

"Further, Union agrees when, in Union's opinion, this well has been completed in the manner and to the depth above specified, and when evidence has been obtained that the well has been plugged and abandoned as a dry hole, to pay to the Operator the sum of $2.00 per foot of all hole drilled, not to exceed a total of $17,900.00."

\* \* \* \* \* \*

"The assignment of acreage and the dry hole contribution pertaining to each of the three tests heretofore mentioned will be made separately within 30 days after the completion of each of these three tests and will not be dependent or be conditioned upon the drilling or completion of each other, except that each test must be commenced according to the time table established by the drilling and completion of the first test."

\* \* \* \* \* \*

"Time shall be of the essence of this agreement in all its parts."

The evidence reveals that the Wrobbel-Geis No. 1, which was the first well covered by said agreement, was drilled as a wildcat to the Manning formation at about 8762–8792 feet and was drill-stem tested showing approximately 730,000 cubic feet of gas. The well was then drilled down to the Mississippi Lime at approximately 9,280 feet, at which time casing was set and the Mississippi Lime tested but found to be without a show. The operator then backed up to the Manning, perforated, sand-fractured and acidized the formation and had a showing of approximately 965,000 cubic feet of gas. For 16 days gas from this formation was vented and certain tests were made and the well cleaned out. Approximately 11,000,000 cubic feet of gas was so vented. Tests to improve production were authorized to October, 1961. It appeared that the well would make approximately 700,000 to 800,000 cubic feet of gas per day. At this time the nearest pipe line was six miles to the east and belonged to the Oklahoma Natural Gas

Company. There was another pipe line seven miles to the south belonging to Mustang Fuel. The nearest producing well was six miles to the east. The supervisor in charge of drilling the above well for the plaintiff estimated the gas reserves of this well at this time to be between 2 and 2½ billion cubic feet of gas and hoped to make a producer of same. All provisions of the agreement were complied with by the operator with reference to the depth drilled, and the manner in which the well was drilled and tested. Also, all provisions of the agreement were complied with in proper and reasonable fashion with reference to furnishing all pertinent information and data to the defendant and allowing the defendant to have access to the drill floor and to all the records and other information regarding the well.

On June 8, 1961, efforts were undertaken by the plaintiff to obtain action on the part of Oklahoma Natural to extend its pipe line to this well. These efforts continued for several months with *Oklahoma Natural* showing interest but eventually the same proved fruitless when in July of 1962 this pipe line was extended but in a northerly direction and away from this well even though in the process the line came one mile closer to or approximately five miles from the well. Studies were also made by the plaintiff with reference to laying its own pipe line at its own expense to the nearest pipe line which was found to require an outlay in the neighborhood of $30,-000.00 for the line and approximately $6,000.00 for the necessary equipment to connect the well with the line and transport the gas from the well into the nearest pipe line. Sometime after the above well was drilled further exploration in the area was undertaken by others with a well started in the section immediately north of the subject well.

On July 3, 1961, the plaintiff wrote the defendant, bringing the defendant up to date with reference to the posture of the well, termed the well as non-commercial, requested advice with reference to the advisability of abandoning the well and also called for any suggestions the defendant may have with reference to any other action that should or might be taken with reference to the well. The defendant did not answer this communication.

While the Corporation Commission had not established spacing units for this area it was understood and agreed by all that a spacing order of 640 acres was proper and would be fixed. By the summer of 1962 the closest producing well was over five miles from the subject well. The well in the section to the north was completed on the 7th day of June, 1962, showed practically no porosity and only approximately two feet of the Manning formation. The same was plugged and abandoned as a dry hole.

After the north offset was plugged and abandoned as dry and the nearest pipe line was extended away from the well, by letter dated August 21, 1962, the plaintiff notified the defendant that it had decided to plug and abandon the subject well as a dry hole and made request for the payment of the stipulated dry hole money from the defendant. The well was plugged in October, 1962, and defendant furnished with the record of such action. The defendant refused to remit and this litigation ensued.

Briefly stated, it is the contention of the plaintiff herein that the subject well was a dry hole within the meaning of the pertinent provisions of said agreement even though the same was capable of producing some gas but which was not reasonably marketable. Further, that the plaintiff as the operator was entitled with due diligence to watch and await developments with reference to other drilling activities in the vicinity and pipe line extensions and was not restricted by the terms of the agreement or any usage of the oil industry to a particular period of time within which it had to plug and abandon the well, declare the same to be a dry hole and make demand for the dry hole money. Lastly, the plaintiff asserts that with reference to laying its own pipe line some five miles in distance and hooking up the well through this

pipe line at a cost of approximately $36,-000.00, such action was not economically warranted based upon the advice and information available to it by the summer of 1962 and that the decision of the operator not to expend this money and lay the pipe line was made in the negative in good faith, without fraud, upon sound grounds, and should be and must be binding upon the defendant with reference to the dry hole money.

The position of the defendant herein, briefly stated, is that the subject well was not a dry hole within the meaning of said agreement, inasmuch as the same was capable of producing some gas. Further, that time being of the essence of this contract, the above mentioned 30-day provision in the contract should be enforced against the plaintiff following the completion of drilling on May 9, 1961, as the time within which plaintiff must plug and abandon, declare the well to be a dry hole and make demand of the defendant for dry hole money and, further, that according to its economics the plaintiff was not warranted in failing to expend the additional sum of $36,000.00 to build its own pipe line and connect the well to the nearest pipeline and thus provide the necessary transportation facilities to provide a market for the gas that could be produced from the well. Defendant also pleads that plaintiff was under a requirement to elect whether the well was dry or a producer and that plaintiff made such an election to the latter effect and is bound thereby, and further pleads that plaintiff is now estopped to claim the well to be a dry hole.

■■ The Court will now dispose of the plea of election for the reason that a requirement to elect is not found in said agreement and defendant has presented nothing to the Court by either evidence, law, or usage to support such as a defense under the facts of this case. Moreover, the Court specifically finds that the plaintiff by its conduct and statements with reference to the well cannot be said to have elected at any time to consider the well a producer under the said agreement of the parties and forego the dry

hole money. The Court will also now dispose of the plea of estoppel for the reason that the evidence wholly fails to establish the essential elements necessary to support this plea. This is to say that the evidence fails to establish any false representations by plaintiff to defendant as well as any of the other essential elements of the defense of estoppel. See Continental Oil Co. v. Rapp, Okl., 301 P.2d 198.

Thus, we have three principal issues in this litigation, as follows:

1. Can a well be a dry hole under said agreement even though it is capable of producing some gas if there is no available pipe line and no reasonable ability to market the gas from the well and realize any income from the operation?

2. Under the terms of the agreement, was the operator entitled to watch developments and wait until August of 1962 to notify defendant of intent to plug and abandon the well, declare the same to be a dry hole and make demand for the dry hole money, or was it necessary for the operator to do so within some shorter prescribed or fixed period of time under the agreement or usage in the oil industry?

3. Was the plaintiff justified in not building its own pipe line to obtain a market for the gas or is defendant bound by the plaintiff's decision not to build its own pipe line in the absence of bad faith, fraud or unconscionable conduct?

■ With reference to whether or not the well is to be considered a dry hole under said agreement, the Court is faced with a lack of pertinent authorities in this precise area. The closest case appears to be Humphrey v. Placid Oil Co., D.C., 142 F.Supp. 246, affirmed 5 Cir., 244 F.2d 184, which, while not directly in point, would appear to recognize that a dry hole is one not capable of producing oil or gas in paying quantities. An analogy to the proposition here involved would be the matter of the extension of a lease past the primary term by a well which must be in production. The courts

almost all hold that such a well must produce in paying quantities and if it does not then the well is considered a dry hole. Whitaker v. Texaco, Inc., 10 Cir., 283 F.2d 169. It would appear to be the best approach to this proposition for the courts to consider each situation on its own facts. In view of the evidence here as above outlined, the Court is of the opinion and so holds that this well must be considered to be a dry hole within the meaning of that language as used in the agreement of the parties. Nothing to the contrary has been shown to the Court as usage in the oil and gas industry. It appears to be the rule under the cases that transportation facilities for *gas* are a definite factor in determining whether or not a *gas well* may be considered to be a producer in paying quantities.

In Hanks v. Magnolia Petroleum Company, Tex.Com.App., 24 S.W.2d 5, the Supreme Court of Texas considered what elements were to be included in the "operating costs" of the lessee in connection with whether or not the well was producing in paying quantities. In the determination of that question the court held:

"Unlike oil, gas cannot be produced and stored. In order that it may have a value, there must exist pipe lines through which it may be marketed. If no such facilities exist in the vicinity in which a gas well is brought in, the question as to whether the gas produced by such well is in paying quantities must necessarily depend upon the cost of construction of facilities for carrying such product to a prospective market and the price received therefor. The returns from the sale thereof must be such as would leave a profit in marketing the gas under such conditions."

In Archer v. Skelly Oil Company, Tex. Civ.App., 314 S.W.2d 655, the court said:

" 'What might be determined to be gas in paying quantities in one well would not be so considered in another located in a different ter-

ritory. A well producing much less gas than the one drilled by the plaintiff in error might be in paying quantities because of existing pipeline facilities furnishing a means of marketing the gas at a profit above the cost of operating the well. On the other hand, a well producing a large amount of gas drilled in a territory remote from any market and without pipeline facilities might not be in paying quantities, unless it was shown that the amount of gas produced was sufficient to justify the construction of transportation facilities and the marketing of such gas would yield a return over and above the expense of providing the same.' "

Thus, the Court finds that this well was a dry hole under said agreement notwithstanding its ability to produce some gas inasmuch as under the circumstances here present the gas was not reasonably marketable, could produce no income to the parties, in fact never produced any income to the parties, and such well must therefore be deemed to be one not capable of producing oil or gas in paying quantities and a dry hole.

With reference to the second proposition above set out, the Court is unable to obtain from the language of said agreement the result urged by the defendant. In the first place, the Court finds that the 30-day period mentioned in the agreement does not relate to any duty required of the plaintiff as operator but rather is confined to the period within which defendant must assign acreage and pay the dry hole money after being presented with evidence that the well has been abandoned and plugged as a dry hole. Also the Court is unable to attach to the "time shall be of the essence" sentence in the agreement, the import urged by the defendant. This agreement is full of many specific dates with reference to the commencement of the three wells and other details. The Court believes that this sentence relates only to those parts of the agreement which contain and prescribe some definite date or definite time period within which

some action must be taken or completed and cannot be considered as establishing a time period of a specific nature in some area not so treated by the agreement of the parties. This is to say that the agreement does not prescribe any specific time period within which plaintiff as operator must plug and abandon the well and declare the same to be a dry hole and demand his dry hole money. See Williston on Contracts, Third Edition, Vol. 6, Sec. 846, p. 181. It is believed that the plaintiff as the operator would have a reasonable time under the agreement and under all of the circumstances within which to take such action. It would appear to the court that the delay here, if it can be fairly called a delay, could not act to the prejudice or detriment of the defendant but rather would be to the best interests of the defendant in perhaps affording time and opportunity to cause the well to become a producer in paying quantities and obviate any dry hole contribution and otherwise benefit the defendant with reference to other considerable acreage owned by it in the vicinity. The court finds under the circumstances in this case that the plaintiff as the operator was fully justified in placing the well in a stand-by condition and watching and awaiting developments as to other nearby drilling activities, the possible opening of a pool by such and the possible extension of existing pipe lines in the vicinity to the subject well. Under the evidence of this case, the plaintiff, in the opinion of the Court, conducted itself as a prudent operator in attempting to place this well in production and in all other steps taken in connection with attempting to obtain an extension of existing pipe lines and the study of available data from other nearby drilling operations. The Court does not feel that the lapse of time until August, 1962, under the circumstances of this case, is an unreasonable time for the operator to study the over-all situation and within which to eventually decide to plug and abandon the well, declare the same to be a dry hole and demand dry hole money.

The third proposition is connected with the first proposition. The plaintiff as operator evaluated the capabilities of the well when drilling was completed in May of 1961, attempted to cause existing pipe lines to be extended to the well, promptly investigated the matter of the cost of laying its own pipe line to the nearest existing pipe line. Then in the summer of 1962 when further data was obtained from the dry offset to the north and other operations in the vicinity and the nearest pipe line was extended away from the well, all of which information was also available to the defendant, the plaintiff re-evaluated the capabilities of the well, gave consideration to the necessary expense in laying its own pipe line and under the economies of the situation reached the conclusion that such action was not warranted, was not feasible and should not be accomplished in this case.

In this re-evaluation the plaintiff fairly concluded that the gas reserves of this well were only ¾ to one billion cubic feet instead of between 2 to 2½ billion cubic feet; that the daily allowable for this well would permit only 270,000 cubic feet of gas per day to be produced; that it would not be economically feasible to expend the money to lay such a pipe line unless the well had gas reserves of 3 to 4 billion cubic feet. In the meantime, plaintiff sought the advice of the defendant in this area and none was forthcoming. The defendant at the trial now presents evidence regarding the economics of the situation which the defendant urges would show that had the plaintiff laid such a pipe line at its expense it would receive from such action ample income to pay for the same, pay for the operating expenses of the well and make a profit to the plaintiff. However, defendant's expert witness Hamilton testified that he couldn't say for sure that the pipe line would pay out. Both parties agreed during the trial that this well belonged to the plaintiff and that by reason thereof the plaintiff had exclusive authority with reference to such matters

as attempting to make a producer of the well capable of providing income to include the matter of obtaining the essential transportation facilities to allow the gas to be marketed. Neither side was able to present the Court with any authorities which have treated with this precise question. Thus, the Court first concludes from the evidence that the plaintiff was justified, in view of the data and advice available to it during the period beginning May 9, 1961, and ending on August 21, 1962, in not laying its own pipe line at an expense of $36,000.00. Secondly, the Court concludes that the decision with reference to expending additional funds to obtain marketing facilities or transportation facilities for gas which could be derived from the well was a matter that rested within the exclusive judgment and decision of the operator, provided the same is not made in bad faith, is not tainted with fraud or collusion, or cannot be deemed unconscionable under the circumstances of the case. It should be noted that at the critical time the plaintiff sought advice and suggestions from the defendant in this area to no avail, and further that the defendant never requested, suggested or demanded of the plaintiff at any time prior to plugging and abandoning the well that the plaintiff build such a pipe line at its own expense. Rather, it appears to be the position of the defendant now at the trial that it would have preferred that the plaintiff sit on this well and keep the same in status quo and see if the future might not bring some favorable developments or pipe line connections to the area. It would appear to the Court that the defendant is not entitled to take this position. It is believed that the plaintiff is empowered to make this decision and that this decision should be binding on defendant with reference to dry hole money provided it is not tainted with any of the conditions above described.

It is, therefore, the finding, conclusion and decision of the Court that the well involved in this litigation is deemed to be a dry hole under the agreement of the parties entitling the plaintiff to the prescribed dry hole money; that the plaintiff conducted itself as a prudent and reasonable operator in connection with attempting to make the well capable of producing gas to the market and under the circumstances was not restricted in point of time in this connection and in demanding dry hole money except to be reasonable and prudent under the circumstances. The Court further finds that the plaintiff was supported by reliable data and advice and also acted in good faith, without fraud or bad motive in deciding not to lay approximately five miles of pipe line at its own expense but rather to plug and abandon the well as a dry hole.

Accordingly, plaintiff is entitled to judgment herein as prayed for. Interest would be recoverable from November 15, 1962, at the legal rate. 23 O.S.A. § 6; Ottinger v. United States for the Use of Brown, 230 F.2d 405 (10 Cir.Okla.).

Counsel for plaintiff will prepare an appropriate judgment in conformity with the foregoing and present the same to the Court for execution and filing herein.