414

No. 33,878

The Wolf Creek Oil Company, and The T. M. Deal Oil and Gas Company of Kansas, *Appellees,* v. The Turman Oil Company, *Appellant.*

(83 P. 2d 136)

Opinion filed October 8, 1938.

*E. C. Flood, Clayton S. Flood,* both of Hays, *C. E. Cooper* and *Harry Brelsford,* both of Tulsa, Okla., for the appellant.

*Glenn Porter, Getto McDonald, Dwight S. Wallace, William Tinker,* all of Wichita, and *Henry F. Herrman,* of Hays, for the appellees.

The opinion of the court was delivered by

Allen, J.: The action was to quiet title to certain oil and gas leases. Plaintiffs recovered judgment, and defendant appeals.

On April 15, 1936, the defendant Turman Oil Company owned undivided interests in and to the minerals under the NW ¼ of the NE ¼, and the SE ¼ of section 4, township 12 south, range 17 west, Ellis county, Kansas. The Wolf Creek Oil Company wished to secure oil and gas leases on this property. On the date above named a contract was entered into between the parties which provided that the lessee, the Wolf Creek Oil Company, would within 30 days from the date thereof commence the drilling of a well for oil

and gas in the northwest corner of the SW ¼ of section 4, township 12 south, range 17 west, at a point which would be a direct offset to the southwest location on the NW ¼ of the section, and would drill the well with due diligence and dispatch to a depth of 3,700 feet, unless oil or gas was encountered in paying quantities above that depth, or unless the siliceous lime was encountered above such depth and found to be dry, or unless granite was encountered which would make further drilling impossible.

If the well drilled in the northwest corner of the SW ¼ of section 4, township 12 south, range 17 west, produced oil or gas in paying quantities the lessee agreed within 30 days from the date of the completion of the well as a producer, to commence operations for the drilling of a well offsetting the well just completed on the NW ¼ of section 4, township 12 south, range 17 west, and to prosecute the drilling with due diligence to a depth of 3,700 feet, unless oil or gas was encountered in paying quantities above that depth, or unless the siliceous lime was encountered above such depth and found to be dry, or unless granite was encountered which would make further drilling impossible.

The contract further provided that upon completion of the well in the northwest corner of the SW ¼, and upon the commencement of the well in the NW ¼, within the time provided, the Turman Oil Company agreed to execute and deliver to the lessee three certain oil and gas-mining leases of its interest in the properties first above described. It was agreed that in the event the first well should be a dry hole, lessor agreed to deliver to lessee the oil and gas leases.

It was provided that time should be of the essence of the contract. The record is silent as to the ownership of the leases on the SW ¼ of section 4, mentioned in the contract.

By the contract the Wolf Creek Oil Company was required to drill the Dreiling well on the southwest quarter with due diligence and dispatch to a depth of 3,700 feet unless: (a) Oil or gas was encountered in paying quantities above that depth; or (b) the siliceous lime was encountered above such depth and found to be dry; or (c) granite was encountered which made further drilling impossible.

If the Wolf Creek Oil Company completed the well as a dry hole, either at 3,700 feet, or in the siliceous lime, or encountered granite, it was entitled to receive from the Turman Oil Company the oil and gas leases described in the contract. If the well produced

oil or gas in paying quantities at any depth, the Wolf Creek Oil Company was required within 30 days from completion of the well as a producer to commence operations for the drilling of the Bemis well on the northwest quarter, and the Turman Oil Company was then required to deliver the leases.

The case was tried by the court, and findings of fact and conclusions of law were made. The court found that the well on the southwest quarter was commenced in time and was drilled with due diligence until the Kansas City lime was reached at a depth of 3,350 feet, on or about the 4th day of November, 1936; that a test was made in the Kansas City lime, and a potential taken on the 22d and 23d days of November, 1936, and a potential was allowed in the sum of 354 barrels; that thereafter, a pipe-line connection was made with the tanks located upon the lease, and oil was produced from the Kansas City lime from the 11th of December until the 31st of December, 1936; that the production of the well diminished until on and about the 22d and 23d days of December, 1936, the well would not produce more than 30 or 35 barrels from the Kansas City lime, and that on or about the 23d day of December, 1936, the plaintiff, the Wolf Creek Oil Company, and the plaintiff, T. M. Deal Oil & Gas Company of Kansas, assignee of a part of the leases, determined that the well was not producing and would not produce in paying quantities from that horizon, and on January 2, 1937, began operations to deepen the well to the siliceous lime; that the well was deepened and the siliceous lime was found on the 5th day of March, 1937; that the well was completed at the siliceous lime on the 22d day of March, 1937, and a potential secured of 1,297 barrels.

The court found that on December 19, 1936, the president of the Wolf Creek Oil Company, O. E. Sutter, executed an affidavit stating that a derrick was being erected for the drilling of a well on the northwest quarter, and sent the affidavit, together with a letter, to the defendant dated December 21, 1936, stating the well on the southwest quarter was completed as a producing well on November 23; that at the time the affidavit was made, and the letter sent to the defendant, O. E. Sutter believed that the well was producing, and would produce in paying quantities from the Kansas City lime; that on the 22d or 23d of December, 1936, O. E. Sutter ascertained that the well was not producing and would not produce in paying quantities from the Kansas City lime, and proceeded to deepen the

well; that the plaintiff, the Wolf Creek Oil Company, acting by and through its president, O. E. Sutter, acted in good faith in determining that the well would not produce in paying quantities, and in deepening the well to the siliceous lime.

The court found that oil was not found in the Dreiling well in paying quantities in the Kansas City lime, but there was no evidence that this fact was known to or had been determined by the Wolf Creek Oil Company prior to December 23, 1936.

That on the 11th day of December, 1936, the Wolf Creek Oil Company, by and through its officers acting in good faith, and believing that the Dreiling well was and would be a well that would produce from the Kansas City lime in paying quantities, commenced operations to drill a well on the northwest quarter, offsetting the Dreiling well; that between the 11th day of December, 1936, and December 31, 1936, the Wolf Creek Oil Company built a rig, dug a slush pond, moved in tools and pipe, and laid over a mile of pipe to secure water for the drilling of the well, and spent approximately $4,500 on that location; that after it was ascertained that the Dreiling well was not producing and would not produce in paying quantities, the plaintiff, the Wolf Creek Oil Company, removed the employees from the Bemis well on the northwest quarter back to the Dreiling well, and proceeded with no further operations on the Bemis well until the Dreiling well was completed in the siliceous lime.

That within 30 days from the completion of the Dreiling well in the siliceous lime, the plaintiff, the Wolf Creek Oil Company, proceeded with due diligence to drill the Bemis well to the siliceous lime, and drilled the well into the siliceous lime on May 2, 1937; that the Bemis well was completed in the siliceous lime on May 9, 1937, and a potential was secured on that date of 2,758 barrels.

The court found that the Dreiling well heretofore referred to did not and would not produce oil from the Kansas City lime in paying quantities; that within 30 days from the completion of the Dreiling well as a producer of oil in paying quantities, the Wolf Creek Oil Company commenced operations on the well on the northwest quarter, as provided by the contract.

That pursuant to the affidavit of O. E. Sutter, dated December 19, 1936, and the letter dated December 21, 1936, the defendant sent the leases referred to in the contract to the Wolf Creek Oil Company and no offer to return them was ever made, but that the defendant, Turman Oil Company, was not injured in any respect thereby.

It was found that prior to the time of trial, plaintiffs expended approximately $175,000 in drilling and equipping wells upon the property in dispute, and in producing oil from the wells; that in all of the dealings by the plaintiffs with the defendant, the plaintiffs, through their officers and agents, acted in good faith with the defendant.

The court found, and it is not denied, that the well on the NW ¼ of the SW ¼, known as the Dreiling lease, was commenced in due time and was prosecuted with due diligence. Defendant contends for a forfeiture of the leases because the Bemis well on the SW ¼ of the NW ¼ was not prosecuted with due diligence. As the Wolf Creek Oil Company was required to commence operations on the Bemis well within 30 days after oil was procured in paying quantities on the Dreiling well, it becomes necessary to determine when oil and gas was found in paying quantities on the Dreiling well.

The term "paying quantities" has two distinct uses in the law of oil and gas, and two distinct meanings which are not to be confused. Thus in *Ardizonne v. Archer*, 72 Okla. 70, 178 Pac. 263, the lease provided that "one well on this lease is to be drilled to the top of the Mississippi lime unless oil or gas is found in paying quantities before that lime is reached, unavoidable accidents excepted."

A well was not drilled to the Mississippi lime, but one was drilled to a less depth, at which an oil-bearing stratum was found. This well was shot, equipped and operated for about eight months. At the expiration of that time the oil was so far exhausted that the quantity being then produced was insufficient to pay the costs of further operating the well, and it was plugged and abandoned. This well was not deepened to the Mississippi lime, and there has been no further development of the premises. The cost of drilling and equipping the well was $3,784. During the eight months it was operated, oil was produced of the gross value of $452.85, of which the lessor received one eighth, or $56.60, leaving to the lessee $396.25. The cost of operating the well was $258.05, so that the lessee realized from the oil produced during the eight months, over and above the expense incurred in operating the well after the well had been drilled and equipped, the sum of only $138.20. The trial court concluded that oil or gas had not been found in paying quantities at a less depth and that the covenant to drill to the top of the

Mississippi lime unless it was so found had been breached by plaintiffs in error, for which they were liable in damages.

The court, in discussing the meaning of the phrase "paying quantities," said:

"Plaintiffs in error contend that 'oil or gas in paying quantities' means such quantity as can be produced at a profit, even a small one, over the operating expenses, though the cost of drilling may never be repaid and the operation as a whole may result in loss. Numerous authorities are cited·in support of that interpretation, but all these authorities interpret the phrase as used in the clause fixing the term of the lease, and it may be said that such has come to be the generally accepted definition when used in that connection. When the lessor has agreed that the lessee may hold the premises as long after a fixed term as oil or gas is produced in paying quantities, such interpretation seems to be reasonable and just and may be said to have been that intended by the parties. But because a word or phrase is interpreted as having a given meaning in one clause of a contract, it does not necessarily follow that it has the same meaning in some other clause or when used in some other connection. Even the clear and explicit language of a contract does not necessarily govern its interpretation if such involves an absurdity. (Section 948, Rev. Laws 1910.) To adopt the definition above mentioned as the fixed legal meaning of the phrase wherever used in oil and gas leases would, in some instances, lead to an unreasonable and absurd result, which is never presumed to be intended or contemplated by the parties. For illustration: Some leases contain an express provision to the effect that if, as a result of sinking a test well, oil is found in paying quantities, the lessee shall within a certain time drill a given number of additional wells. It would seem preposterous to hold that under such provision the lessee was obligated to put down the additional wells if the test well produced no more oil than did the one drilled on these premises. In interpreting the term 'found in paying quantities,' as used in that connection, the cost of drilling and equipping the well should be taken into consideration. It has been held that unless oil is found in such quantity as would, taken in connection with other conditions, induce ordinarily prudent persons engaged in like business to expect a reasonable profit on the full sum required to be expended in the prosecution of the enterprise, the lessee would not be obligated to put down the additional wells. (*Manhattan Oil Co. v. Carrell*, 164 Ind. 526, 73 N. E. 1084.) Thus it would seem that the phrase may be interpreted to include or exclude the cost of drilling and equipping wells, according to the connection in which it is used. . . . We think, therefore, that when the lessee obligated himself to drill one well to the top of the Mississippi lime unless oil or gas was found in paying quantities before that lime was reached, the parties mutually intended at the time such quantities as would justify not only the operation of that well by the lessee, but also in such quantities as would indicate that further development could be conducted with the expectation of a reasonable profit on the entire cost thereof: It is very plain from the evidence that oil was not found by the lessee in such quantities, and that the trial court did not err in the conclusion that the covenant had been breached." (pp. 72, 73.)

In Summers on Oil and Gas, page 317, it is said:

"The term 'paying quantities' has two entirely distinct and separate uses in the law of oil and gas. Different meanings have been attributed to the term as employed in different portions of the lease, which should not be confused. The first use is found in connection with express or implied covenants of the lessee to continue drilling operations upon the contingency that test or previously drilled wells have resulted in finding oil or gas in paying quantities. As used in this connection, the term 'paying quantities' means that oil or gas must be found in such quantity that an ordinarily prudent person, experienced in the business of oil or gas production, would, taking into consideration the surrounding conditions, expect a reasonable profit over and above the entire cost of drilling, equipping, and operating the well or wells drilled. On the other hand, where the term 'paying quantities' is used in the habendum clause to express a condition of precedent fact upon which the lease may continue, it is uniformly interpreted as requiring production in such quantity as will pay a small profit over the cost of operation of the well, although the cost of drilling and equipment of the well may never be paid, and the operation as a whole result in a loss to the lessee."

See, also, *Manhattan Oil Co. v. Carrell,* 164 Ind. 526, 73 N. E. 1084; *Keechi Oil & Gas Co. v. Smith,* 81 Okla. 266, 198 Pac. 588; *Aycock v. Paraffine Oil Co.,* (Tex. Civ. App.) 210 S. W. 851; *Denker v. Mid-Continent Petroleum Corporation,* 56 Fed. 2d 725; Mills-Willingham Law of Oil & Gas, 122, 123.

The rule announced by the foregoing authorities is applicable to the situation here presented. From the facts found, the Dreiling well would not produce oil in paying quantities, as thus defined, in the Kansas City lime. It therefore was the duty of the Wolf Creek Oil Company to proceed with the drilling of the well to a depth of 3,700 feet, or until oil was found in paying quantities. This was done and the trial court found that the drilling of the Bemis well was commenced within 30 days thereafter and prosecuted with diligence.

As the court found the Wolf Creek Oil Company acted in good faith, the questions of fraud and estoppel are eliminated from the case. The court found the defendant was not injured by the failure of the lessee to return the leases. Under the facts found by the court, the physical whereabouts of the leases was unimportant. The findings were supported by the evidence and the judgment will not be disturbed.

The judgment is affirmed.

HARVEY, J., concurs in the affirmance of the judgment of the trial court.