No. 48,009

Reese Enterprises, Inc., and Glenn F. Layton, Jr., *Appellees,*
v. Lawson, et al., *Appellants.*

(553 P. 2d 885)

Opinion filed July 23, 1976.

*Richard C. Byrd,* of Anderson, Byrd & Richeson, of Ottawa, argued the cause, and was on the brief for the appellants.

*R. Michael Latimer,* of Skoog & Latimer, of Ottawa, argued the cause, and was on the brief for the appellee Reese Enterprises, Inc.

No appearance or brief was filed on behalf of the appellee, Glenn F. Layton, Jr.

The opinion of the court was delivered by

SCHROEDER, J.: This is an action for a declaratory judgment brought by the holder of an option to purchase an oil and gas lease to establish the validity of the lease. After hearing the matter the trial court refused to declare the oil and gas lease terminated for failure to produce oil in paying quantities. Appeal has been duly perfected by the defendants below who are the owners of one-half of the mineral rights in the tract of land involved. They also own the surface rights.

The various points asserted involve the provisions in the lease regarding termination set forth in the habendum clause of the lease, where oil was initially found in paying quantities and produced under the "thereafter" clause of the lease, requiring that oil be "found in paying quantities."

Reese Enterprises, Inc., (plaintiff-appellee) is a corporation which owns four leases in Franklin and Miami Counties for investment purposes. It is the holder of an option to purchase an oil and gas lease on the 440-acre tract of land in Franklin County, Kansas, here in question and upon which Glenn F. Layton, Jr., the lessee by assignment, was interpleaded as an involuntary plaintiff (appellee). Roy Lawson and his wife (defendants-appellants) own the surface and one-half of the mineral rights of the 440-acre tract of land in question.

To facilitate an understanding of the case the appellants will sometimes be referred to generally as the lessor; Reese Enterprises, Inc., will be referred to as the optionee or Reese; and Glenn F. Layton, Jr., as the lessee.

The oil and gas lease involved, referred to as the Gingrich lease in the record, was executed on January 18, 1916. It covered the west half of section 28; the north half of the northeast quarter of section 29; and the southeast quarter of the northeast quarter of section 29, all in township 16, range 21, Franklin County, Kansas.

Production of oil in paying quantities occurred during the primary term and thereafter until approximately 1971. Through the years the working interest had been assigned numerous times. The lessee is the last assignee of record, having acquired the working interest on April 21, 1971.

At the time the lessee acquired the lease the method of producing oil from the lease was to pump eight wells by means of elec-

tricity. Seventeen other wells were connected to the flow lines which led into the lease tank battery. The lessee was not sure how many wells were located on the property, but he estimated there were between 40 and 50 wells in all. Some of the wells, other than the 25 so-called producing wells, are injection wells which were formerly used by prior lessees to inject salt water into the producing formation in connection with secondary recovery operations. These operations were conducted under a permit from the State Corporation Commission which had expired before the lessee herein acquired the working interest.

At the time water flooding was commenced, the then lessee rented a ten-acre surface tract from the then surface owners of the lease in question upon which was installed a central water treating plant and tank batteries for adjoining leases, which were not unitized with the lease in question. The tank battery for the lease involved here is also on the ten-acre surface lease. An office with a telephone is located on the ten acres. Sometime in 1970 the then lessee failed to pay the rental on the ten-acre surface lease and no rentals have been paid since that time.

After Mr. Layton acquired the working interest on April 21, 1971, as lessee he continued pumping the eight wells until November 1971, at which time he discontinued pumping operations entirely and connected those eight wells to the flow lines leading to the lease tank battery. The lease was then disconnected from its source of electricity in order to avoid electric bills which had been running from $35 to $50 per month.

From November 1971, until May 31, 1973, the lessee's method of "production" consisted of what he called "free flow" into the tank battery. During that period of time the property produced 125 barrels of oil. Thus the actual combined total daily production from 25 wells was roughly one-fifth barrel of oil per day over an eighteen month period. During that time, the lessee checked the lease at least once or twice a week and on occasion three or four times a week. That entailed a drive of five miles each way from Wellsville where he lives. He operated other leases in the vicinity of the Lawson property. Checking the lease also involved looking on occasion into the tank battery to see if oil was running into the tank.

In April 1972, the lessee gave KAI Oil Company a nine month option to purchase the lease. From then until the fall of 1972 a Mr. Gillin of KAI operated the lease for the lessee *at lessee's re-*

*sponsibility.* During the period KAI operated the lease for the lessee, it pulled from one to three wells at a cost of around $30 per well. KAI also re-rocked the entrance road to the office area at an expense of $38 and placed a new cattle guard in the gate at an unknown expense. Mr. Layton, the lessee, thought these were expenses chargeable against the lease.

Although its option to purchase ran through December, KAI decided in the fall of 1972 not to exercise its option. In November 1972, Elmer Sieg, an Eastern Kansas oil operator, inquired about purchasing the lease. From November 1972, through January 1973, he visited the lease approximately ten times. Subsequently, he checked to see if oil was flowing into the tanks. On one occasion it was, and on another it was not. Mr. Sieg decided that he was not interested in the lease if it could not be water flooded.

From the time Producers Pipeline Company ceased buying the oil from the lease in November of 1971, the lessor received only two checks representing royalty payments; one in December of 1972 in the amount of $12.77 and one in November of 1973 in the amount of $9.59. The checks were returned uncashed to Page Oil Company. Those checks represented one-half of the one-seventh royalty payable under the lease.

On February 3, 1973, the lessor demanded in writing of the lessee that he release the lease of record because it had expired by its own terms in that it had ceased to produce oil in paying quantities. The lessee refused to release the lease. On March 21, 1974, the lessee entered into the option agreement with Reese, after Reese had attempted to negotiate a lease with the lessor.

One of Reese's witnesses, Don C. Bloomer, testified that he had pumped this lease in 1967 and 1968, that during that period eight or nine wells were pumped and twelve or fourteen flowing wells were connected to the tank battery. Total lease production was then four or five barrels of oil per day. On the basis of four barrels per day, eighteen months of production by the normal means— that is from November 1971 to May 31, 1973—would equal 2,184 barrels. The same witness testified that the lease in its present condition could not be operated at a profit.

The 125 barrels of oil produced from November 1971 until May 31, 1973, had a gross value of $313.16. Of that amount, the lessee received $268.42 with the overriding royalty owner entitled to $9.79 of that sum.

The lease here in question provides for a one-seventh royalty and contains a term or habendum clause reading as follows:

"To have and to hold the same unto and for the use of the second party, successors and assigns, for the term of one year from date hereof, and *as much longer as oil or gas is found in paying quantities thereon.* . . ." (Emphasis added.)

Reese in its petition for declaratory judgment alleged among other things:

"3. The plaintiff has been informed by defendants that defendants con-consider the lease of which Glenn Layton Jr. is the present holder thereof, to be void and forfeited.

"4. *That the plaintiff verily believes that said lease can be produced to the mutual benefit of plaintiff and defendants by prudently developing said lease.*

"5. That defendant [Lawson] has denied and prohibited Glenn Layton Jr. and/or anyone to come on defendants' property since August, 1973, and defendants have blocked all entrances to the lease premises.

"6. That Glenn Layton Jr. is indebted to the Wellsville Bank in the approximate sum $5600.00 and plaintiff would be required to assume said indebtedness at which time as plaintiff took an assignment of Glenn Layton Jr.'s interest under said lease." (Emphasis added.)

In the prayer Reese asked the court to judicially determine whether "the present lease on which Glenn Layton Jr. is a lessee and defendant is lessor is in full force and effect."

The defendant Lawson answered among other things that the lease was void due to termination as described by its own terms, and that any and all oil produced from the premises after the termination of the oil and gas lease was done in wrongful conversion of the defendants' property.

Upon the defendants' motion Layton was joined as an involuntary plaintiff to the action. Layton answered that as operator of the lease at all pertinent times, since the assignment of the lease to him, it has produced oil in paying quantities as required by the lease instrument. He denied that he was guilty of any wrongful conversion of the defendants' property and further alleged:

"That since August 1973 the defendants have denied and prevented this involuntary plaintiff from coming onto the above described real estate, and said defendants have blocked all entrances to the said leased premises, and that as a result of being prevented from entering said premises, this involuntary plaintiff has suffered damages in the amount of $6,309.27, which is the approximate net loss to the working interest from August 1973 to August 1974, based on production from eight wells at the rate of one-half barrel per day per well."

The defendants denied the allegations of the involuntary plaintiff, and further counterclaimed against the plaintiffs alleging in part;

"4. On the 21st day of March, 1974, plaintiff, Reese Enterprises, Inc., obtained an interest in said lease through a document entitled an Option Agreement executed by Glenn F. Layton, Jr. and Reese Enterprises, Inc., said document being attached to the original pleading filed by the plaintiff herein.

"5. Since April 21, 1971, and until said oil and gas lease terminated by virtue of its own terms as hereinafter alleged, the plaintiff Glenn F. Layton, Jr. was liable to defendants for the breach of any obligations owed by him to defendants under said oil and gas lease or under the statutes and laws of the State of Kansas. That by virtue of the agreement dated March 21, 1974, Reese Enterprises, Inc. likewise became liable to the defendants for the breach of any obligations under said oil and gas lease or under the statutes and laws of the State of Kansas.

"6. On or prior to November, 1971, plaintiff Glenn F. Layton, Jr. ceased producing oil and gas from said lease in commercial quantities or paying quantities, and said lease terminated automatically on said date or prior to said date by virtue of its own terms.

"7. Subsequent to November, 1971, and prior to any resumption of production from said lease by plaintiff Glenn F. Layton, Jr., defendants demanded of plaintiff Glenn F. Layton, Jr. in writing that he release said lease of record. Plaintiff Glenn F. Layton, Jr. failed and refused to release said lease of record and subsequently trespassed on defendants' property, over defendants' objections, and produced approximately 75 barrels of oil therefrom sometime during the months of October, November or December, 1973. Such production of oil by the plaintiff Glenn F. Layton, Jr. constituted an unlawful conversion of defendants' property. The reasonable value of the oil so converted by plaintiff Glenn F. Layton, Jr. was $178.84.

"8. On February 3, 1973, defendants made a written demand on the plaintiff Glenn F. Layton, Jr. to release said lease of record and to rectify the matters alleged herein. Plaintiff Glenn F. Layton, Jr. has refused to comply with said demands in any respect.

"9. As to the release of said lease, this action is brought pursuant to K. S. A. 55-202 under which defendants are entitled to damages in the amount of $100.00 for plaintiff's failure to release said lease of record, to all costs, together with a reasonable attorneys fee, which defendants allege should be at least $1,000.00, and for such additional damages as the evidence warrants.

"10. K. S. A. 55-132(a) provides that where, as here, a lease assignment as to the plugging and abandonment of wells located thereon and as to the removal of surface obstructions upon termination, the Lessee shall within six months thereafter remove all abutments and other obstacles of every kind used in connection with the operation of such lease, and shall grade the surface in such manner as to leave the land, as nearly as practicable, in the same condition as it was before such structures and abutments were placed thereon. Plaintiffs have failed and refused to comply with said statute, which was enacted for defendants' benefit, by failing to remove tanks, treatment plant, jacks and related pumping equipment, and pipes and fittings.

"11. K. S. A. 55-128 imposes on plaintiffs the duty of plugging all wells in accordance with the methods, rules and regulations of the State Corporation Commission of the State of Kansas before abandoning the same. Pursuant to said statute, said Commission duly adopted rules 82-2-307 through 82-2-310, which said rules have been duly authenticated and are on file in the office of the revisor of the statutes of the State of Kansas, and have been duly published in the Kansas Administrative Regulations and by virtue thereof have the force and effect of law. The plaintiffs have failed and refused to comply with the obligations imposed upon them by such statutes and rules which were enacted for the benefit of the defendants as well as for the preservation of the natural resources of this state in that to the extent hereinafter alleged the plaintiffs have not notified said Commission that they intend to abandon or have abandoned said wells and that plaintiffs have not plugged said wells as required by said statutes and rules, but instead have left them unplugged.

"12. Plaintiff's failure to properly plug said wells has injured and is injuring the defendants in that oil has been and is being permitted to seep from said wells permanently damaging defendants' land.

13. The damages sustained by defendants by virtue of plaintiff's failure to comply with the obligations alleged in the three preceding paragraphs are as follows:

"A. The reasonable cost of plugging said wells . . . . . . . . . . . . $5,000.00;

"B. The reasonable cost of restoring the surface of defendants' land . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10,000.00;

"C. The reasonable cost of removing and disposing of the abandoned tanks, treatment plants, jacks, pumping equipment, pipe and fittings . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5,000.00.

"14. Plaintiffs have failed and refused to remove the personal property located on defendants' property and that such failure has continued for an unreasonable length of time and that for said reasons said property has become the property of the defendants."

The pretrial memorandum of the trial court recited:

"Plaintiff Reese Enterprises, Inc., has an option dated March 21, 1974, at a cost of $50 for an assignment of the lease upon payment to the Wellsville Bank of $5,600 indebtedness thereon at the end of six months."

The pretrial memorandum further recited the issue as to whether the lease had terminated according to the habendum clause would be tried separately. It recited that, "Layton will contend the oil was flowing all the time and was therefore 'found in paying quantities.' "

The trial court on September 23, 1974, heard the issue as to whether the oil and gas lease had terminated. The findings generally are in accord with the facts heretofore recited. Among the findings are the following:

". . . On the 3rd day of February, 1973, Layton received a letter from Lawson's attorney requesting his assistance in clearing the title of Layton's 'void' lease and requesting him to plug the wells, clean up the lease and remove his personal property from the land. None of the wells were plugged

and no clean up work was done on the lease after the letter requesting said work to be done was received. During March and April, 1973, Layton removed storage tanks from a ten-acre surface lease on the real estate owned by defendants Lawson covered by the lease in question.

"6. On May 31, 1973, Layton and others employed by him were in the process of removing additional storage tanks from the ten-acre surface lease. In preparing to remove tanks not connected to wells on the lease in question, Layton disconnected the flow line from the oil wells on this lease. While in the process of moving the tanks on May 31, 1973, Lawson advised Layton that he was about to lock the gate and they had better get their trucks off the lease. Layton and his employees left as directed by Lawson without reconnecting the lines from this lease and consequently fluids from the wells have continued to flow on the ground and, except to retrieve a water jug, Layton has not been on the lease since May 31, 1973.

"7. Layton testified that from November, 1971, to May, 1973, he operated the lease at a small profit over and above operational expenses. His total income from oil sold from the lease less ⅛th royalty for 18 months after suspending pumping operations on the lease in November, 1971, was $268.42 to May 31, 1973, when Lawson locked the gate. Taxes for two years, 1972 and 1973, were $165.00 total. Gillin of K-A-I Oil Company, during his option period, put two loads of rock on an entrance road, repaired a cattle guard and pulled one to three wells *at no cost to Layton*. Layton had other leases in the vicinity with an office with a telephone on the ten-acre surface lease located on the Lawson property. He would check the lease in question from time to time in connection with the supervision of other leases and the use of the office and tank battery for other leases located on the surface lease.

"8. In March, 1974, the involuntary plaintiff, Layton, entered into an option agreement with Reese Enterprises. *Reese stands ready, willing and able to perform cleanup work, plug all unproductive wells not able to be used as injection wells, and continue to develop the lease to the mutual benefit of Reese and Lawson. Reese Enterprises takes the position that the lease, if operated properly, would be profitable.* (Emphasis added.)

The trial court then continued with its memorandum and conclusions of law as follows:

"*The matter of forfeiture at this time, considering the evidence presented, is being determined as indicated in the conclusions.*

"Some consideration was given to the distinction between the terms 'found in paying quantities' and the term 'produced in paying quantities' interpreted in *Wilson v. Holm,* 164 Kan. 229, [188 P. 2d 899] and most of the Kansas cases cited. A number of the cases referred to in the note in *43 ALR 3d,* pages 157 to 166 indicate interpretation that 'produced' is a more affirmative term than 'found.'

"Also, a number of the cases cited referred to situations where there was a complete cessation of production. The evidence in this case was that the wells previously pumped in a secondary recovery, water-flood, project would continue to flow for five to ten years after pumping ceased and that such a flow was still being experienced on May 31, 1973.

### CONCLUSIONS OF LAW

"A. The February, 1973, letter to Layton, on behalf of Lawsons, waives the lessor's right to assert non-production thereafter, particularly after the incident May 31, 1973, when Layton was ordered off the place and locked the gate.

"B. Defendants Lawson have not sustained the burden of proving that the income from November, 1971, to May, 1973, did not exceed the operating expenses excluding investment for the lease and depreciation of equipment and that the operation as a whole resulted in a loss to the lessee.

"C. *The lessee, or his assigns, will,* upon request of the lessor, *be given a reasonable time to take reasonable steps necessary to bring the lease to better production for the benefit of all.* Upon failure so to do, *forfeiture* can then be ordered." (Emphasis added.)

The trial court, after hearing the motion for a new trial argued, modified its finding of fact in paragraph 7 by amending it to provide that, "Layton expended the sum of $38.00 for two loads of gravel on said lease and further, that one to three wells were pulled at a cost of $30.00 per well."

The appellants contend the trial court erred in considering this case as one involving forfeiture. It is apparent from the memorandum portion of its opinion and paragraph C of its Conclusions of Law the trial court considered this to be an equitable action in which the defendants were asking the court to declare an existing oil and gas lease forfeited. This was not the issue tendered. The claim was that the lease had expired by its own terms, and that the court should simply declare the legal situation which existed under the facts. (See, *Wilson v. Holm,* 164 Kan. 229, 188 P. 2d 899.)

It has consistently been held in this jurisdiction that a court of equity has no power to extend a lease beyond the term which the parties themselves have fixed by their written contract. This was the situation presented in *Kahm v. Arkansas River Gas Co.,* 122 Kan. 786, 253 Pac. 563, where the court said:

"A court of equity has no power to extend a lease beyond the term which the parties themselves have fixed by their written contract. We have considered this question in *Elliott v. Oil Co.,* [106 Kan. 248, 187 Pac. 692], and here as there we find it impossible to deny to plaintiffs the relief to which their ownership and right of possession entitle them, especially when the rights which they seek to enforce are in literal accord with the contract of lease which defined and limited the rights of defendant.

"It is urged that plaintiffs could be adequately compensated in damages. Damages for what? For an arbitrary judicial extension of the lease term? There is no sound rule of law or equity to justify any such proposition. There was no such issue raised by the pleadings. When gas production wholly

ceased in the Kahm well in May, 1925, because of low pressure and want of a market, defendant did not tender to plaintiffs any consideration as damages or rent for an extension of the lease. It made no such tender in its pleadings. This point lacks merit.

＊ ＊ ＊ ＊ ＊

"It is also contended that the lease could not be forfeited while the lessees were still receiving benefits from it. As an abstract proposition of law, that contention is sound. But this was not an action to forfeit an existing lease. . . . " (pp. 791-792.)

Other Kansas cases have held that where the terms of an oil and gas lease are clear and unambiguous, and there is no showing of mistake on the part of the parties, the court cannot and should not extend the term of the lease beyond the period clearly provided in the lease. (*Hanscome v. Coppinger,* 183 Kan. 623, 331 P. 2d 590; *Warner v. Oil & Gas Co.,* 114 Kan. 118, 217 Pac. 288; *Caylor . v. Oil Co.,* 110 Kan. 224, 203 Pac. 735; and *Harter v. Edwards,* 108 Kan. 346, 195 Pac. 607.)

In *Caylor* the lease according to its terms was to endure "for one year and as much longer as oil or gas is found in paying quantities." That term expired, the court said, when the production of gas ceased. It further said, "[w]hen the facts did transpire which brought about a forfeiture or termination of the lease, the defendant's duty to clear the record became mature and absolute." The difference between the court's authority in cases involving term clauses on the one hand and implied covenants on the other is further clarified in the *Kahm* case where the court said:

"Defendant presses upon us the evidence touching its efforts to find another market for the gas in the Kahm well. That evidence might be quite persuasive if this were a case for the exercise of the trial court's equitable discretion on the point whether some implied covenant of a gas lease had been so grossly violated as to warrant a forfeiture where the time it was to run had not yet expired. Such cases were *Howerton v. Gas Co.,* 81 Kan. 553, 106 Pac. 47; *id.,* 82 Kan. 367, 108 Pac. 813; *Alford v. Dennis,* 102 Kan. 403, 170 Pac. 1005; *Brown v. Oil Co.,* 114 Kan. 166, 217 Pac. 286." (p. 791.)

Under Kansas law a conventional oil and gas lease generally does not create any present vested estate in the nature of title to land which it covers, but merely creates a license to enter on the land and explore for such minerals. (*Burden v. Gypsy Oil Co.,* 141 Kan. 147, 40 P. 2d 463; *Connell v. Kanwa Oil Inc.,* 161 Kan. 649, 170 P. 2d 631; and *Riverview State Bank v. Ernest,* 198 F. 2d 876, 34 A. L. R. 2d 892 [10th Cir. 1952], cert. denied, 344 U. S. 892, 97 L. Ed. 690, 73 S. Ct. 212.) Once the lease expires by its terms,

the right to enter and explore expires. (38 Am. Jur. 2d, Gas & Oil, § 214.)

Reese points to the testimony of Mr. Layton concerning his attempts to further develop the lease. The question here presented does not relate to the steps reasonably necessary to bring the lease into better production for the benefit of both the lessor and the lessee or to further develop the lease. Rather, the question is whether the lease has expired by its own terms. (*Baker v. Huffman*, 176 Kan. 554, 271 P. 2d 276.) This case involves a habendum clause, which expressed a condition of precedent fact upon which the lease may continue.

It is generally accepted that the phrase "in paying quantities" in the "thereafter" provision (extension clause) of an oil and gas lease's habendum clause means production of quantities of oil or gas sufficient to yield a profit to the lessee over operating expenses, even though the drilling costs, or equipping costs, are never recovered, and even though the undertaking as a whole may thus result in a loss to the lessee. In this connection the term "found in paying quantities," as used in the habendum clause of the lease here in question, is uniformly interpreted as requiring "production in paying quantities." (Annot., 43 A. L. R. 3d 8 [1972].) In *Tedrow v. Shaffer*, 23 Ohio App. 343, 5 Ohio L. Abs. 373, 155 N. E. 510 (1926), the court said:

"What did the parties mean by this 'unless' clause? It is common language in oil and gas leases. We see reason for holding that the word 'found' as here used is synonymous with the word 'produced,' since oil in the ground cannot be said to be 'found' until it is brought to the surface, and when brought to the surface is then 'produced'. . . ." (p. 346.)

In *Smith v. Hickman*, 14 Pa. Super. 46 (1900), the court said:

". . . The clause of the lease last above recited, however, has been frequently passed upon by our Supreme Court in construing oil and gas leases, and has a well defined meaning. The phrase, 'and as much longer as oil or gas is found in paying quantities,' means, and as much longer as, under the operations of the lessee, oil or gas continues to be produced in paying quantities. So long as the wells drilled by the lessee continue to supply oil or gas in paying quantities the lease remains in force. . . ." (p. 51.)

(See also *Cassell v. Crothers*, 193 Pa. 359, 44 Atl. 446 [1899]; *White v. Young*, 409 Pa. 562, 186 A. 2d 919 [1963]; *Union Gas & Oil Co. v. Adkins*, 278 F. 854 [6th Cir. 1922]; and *Wilbur v. United States*, 54 F. 2d 437 [D. C. Cir. 1931].)

The Supreme Court of Kansas in *Tate v. Stanolind Oil & Gas*

*Co.,* 172 Kan. 351, 240 P. 2d 465, was confronted with a drilling clause in an oil and gas lease using the expression "found in paying quantities" and a habendum clause designed to continue the lease beyond the primary term, where oil or gas was found in paying quantities, for a secondary term "as long thereafter as oil or gas, or either of them is produced from said land." The court there found it necessary to construe the ambiguity between the habendum (the term clause) and the drilling clause of the oil and gas lease in question. It held the conflict was not irreconcilable and the lease was given a practical construction which most reasonably effectuated the intention of the parties and permitted both provisions to be operative. A court of equity was there confronted with an action designed to have the oil and gas lease forfeited where production was not immediately undertaken upon discovery of oil in paying quantities. That is not the situation confronting the court in the instant case.

The production of oil or gas "in paying quantities" as used in oil and gas leases was said in *Wolf Creek Oil Co. v. Turman Oil Co.,* 148 Kan. 414, 83 P. 2d 136, to have two entirely distinct and separate uses in the law of oil and gas, with different meanings, which were not to be confused, attributable to the term as it was employed in different portions of the lease. The first instance was said to be in connection with express or implied covenants of the lease to continue drilling operations upon the contingency that tests, or previously drilled wells, had resulted in finding oil or gas in paying quantities. As used in that connection the term "paying quantities" meant that oil or gas had to be found in such quantities that an ordinarily prudent person, experienced in the business of oil or gas production, would, taking into consideration the surrounding conditions, expect a reasonable profit over and above the entire cost of drilling, equipping, and operating the well or wells drilled. On the other hand, where the term "paying quantities" was used in the habendum clause to express a condition of precedent fact upon which the lease might continue, it was said to be uniformly interpreted as requiring production in such quantities as would pay a small profit over the cost of operating the well, although the cost of the drilling and equipping the well might never be paid, and the operation as a whole might result in a loss to the lessee.

As used in the habendum clause, the phrase "paying quantities" refers to operations of the lease after drilling has been accomplished during the primary term and production has been established.

From the standpoint of grammatical construction of the lease and from the standpoint of the purpose of the habendum clause, the cost of drilling and preparing a well for production, and the ultimate profit to be expected from any particular well, are not taken into account in determining whether or not the lease is producing in paying quantities.

Authorities differ as to whether the phrase "paying quantities" is used to describe an objective standard or a subjective standard. Where the subjective standard is used the determination is based upon the reasonableness or the good faith of the lessee's judgment.

Where the subjective approach is taken the question might well be asked why the matter should be left to the sole judgment of the lessee. At first glance, it would appear that the self-interest of the lessee would provide protection for the lessor. If the lease ceased to be a profitable operation it would appear to be to the interest of the lessee to abandon the project, and it would appear to be unlikely that the lessee would have any interest in continuing to operate at a loss. This conclusion, however, does not take into account the very real factor that the lessee may be interested in preserving his interest for speculative purposes. He may consider it to be to his economic advantage to continue a marginal or losing operation in order to take advantage of possible discoveries in formations other than the formation from which he is producing. He may also anticipate a change in marketing conditions or market prices of oil or gas. There may also be other circumstances which indicate to him that a current operating loss may eventually be turned into a profit in the long run. (2 Kuntz, A Treatise on the Law of Oil and Gas, § 26.7 [e], [f] and [g] [1964].)

Many of the early cases, which have taken the position that the requirement of production in paying quantities is actually for the benefit of the lessee, hold that the determination of whether or not the lease is producing in paying quantities should be left to the judgment of the lessee when that judgment is exercised in good faith. (See cases accumulated in 2 Kuntz, A Treatise on the Law of Oil and Gas, § 26.7 [e] [1964].) Under those cases, the test to be applied is theoretically subjective in nature, with the determination turning upon the presence or absence of good faith on the part of the lessee. There the test actually becomes one of determining what a reasonably prudent operator would do for the purpose of making a profit and not for purposes of speculation.

In our opinion the better approach is to follow the innumerable

cases which apply an objective test, where the determination of "paying quantities" turns upon a mathematical computation. (See cases accumulated in Annot., 43 A. L. R. 3rd 8 [1972]; 21 J. B. A. K. 320 [1953]; and 2 Kuntz, A Treatise on the Law of Oil and Gas, § 26.7 [1964].) This approach recognizes the interest of both the lessor and the lessee, and it gives the lessor some protection when the burdens of the lease far exceed the meager royalty payments, when they fall below the customary delay rental.

An application of the objective standard to a determination of whether an oil and gas lease is producing oil in "paying quantities" under the "thereafter" clause of the lease is not free from difficulties. To avoid termination of the lease we start with the proposition that the lessee must operate the lease to produce those quantities of oil or gas which will produce a profit, however small, over operating expenses, after eliminating the initial cost of drilling and equipping the well or wells on the lease which are required to prepare the lease for production.

In arriving at the amount of income which has been realized, the lessee's share of production or his share of receipts from the sale of oil or gas is taken into account. More specifically, the income attributable to the working interest as it was originally created is taken into account, and only the lessor's royalty or other share of production is excluded. Thus, the share of production attributable to an outstanding overriding royalty interest will not be excluded but will be taken into account in determining income. (*Clifton v. Koontz*, 160 Tex. 82, 325 S. W. 2d 684, 79 A. L. R. 2d 774 [1959]; and *Transport Oil Co. v. Exeter Oil Co.*, 84 Cal. App. 2d 616, 191 P. 2d 129 [1948].)

Expenses which are taken into account in determining "paying quantities" include current costs of operations in producing and marketing the oil or gas. Most of the costs so incurred are easily identified as being direct costs, and present no difficulty. In this connection the lessee is held accountable for the production of the lease as a prudent operator working for the common advantage of both the lessor and the lessee. All direct costs encountered, whether paid or accrued, in operating the lease as a prudent operator are taken into account. These direct costs include labor, trucking, transportation expense, replacement and repair of equipment, taxes, license and permit fees, operator's time on the lease, maintenance and repair of roads, entrances and gates, and expenses encountered

in complying with state laws which require the plugging of abandoned wells and prevention of pollution.

Turning now to the record of the trial in the instant case, from November 1971, when Layton ceased pumping operations on the lease until May 31, 1973, when all operations ceased, the gross value of the 125 barrels of oil produced was $313.16. Deducting the royalty payments from the gross proceeds for this eighteen month period of time leaves a balance of $268.42 as the gross receipts from the sale of oil produced during the period involved. It should be noted this includes an overriding royalty of .03125 per cent in favor of Bert Hemminger which amounted to $9.79.

From the lessee's gross receipts of $268.42 must be deducted the direct expenses attributable to the operation of the lease. On the evidence presented these may be itemized as follows:

| | |
|---|---:|
| Taxes | $165.00 |
| Gravel | 38.00 |
| Well Pulling | 90.00 |
| Car Expenses | 60.00 |
| New Cattle Guard | ..... |
| Telephone | ..... |
| Junk removed | ..... |
| Well Plugging Permits | 300.00 |

An examination of the lessee's testimony shows that he came to the trial prepared to testify about everything except operating expenses. In this connection his testimony was evasive. Regarding the out-of-pocket expenses in 1972 he testified, "[t]o my knowledge there would have been none." Regarding operating expenses in 1973 he said, "[n]one to my knowledge." Regarding the number of wells pulled he said, "I do not have the record before me." He admitted, however, on cross-examination there were from one to three wells pulled at an operating cost of around $30 each. This we construe as an admission of three wells pulled at a cost of $30 each.

When the lessee was asked about the amount spent on the lease he said, "I do not have the invoices." Regarding the cost of the new cattle guard he said, "I don't have that record." He also testified, "[a]ctually, I don't know" how much money KAI Oil Company spent on the lease. As to the taxes paid on the lease he assumed he paid them in 1972 and said, "I don't have that information before me" and "I am sure that they were paid, yes." He also testified that he did not take taxes into consideration in his testimony when he said that this lease produced at a profit.

During the winter of 1971-1972 the lessee checked the lease here in question at least once or twice a week and on occasion three or four times a week. The trial court found no cost attributable to this item yet the lessee admitted his time involvement was an expense. In addition to the foregoing the lessee checked the lease during November 1972, through February 1973. The record discloses the lessee lives five miles from the lease. The cost of ten cents per mile to operate a truck or automobile are attributable to the expense in operating this lease and thus makes a round trip cost $1. Carrying the calculation to its logical conclusion the lessee spent at least $60 "checking" the lease during the period involved. When the lessee was asked how he could determine that he had a profit from operating the lease, if he did not know how much money he spent on the lease, he answered, "The expense to pay that indebtedness was furnished by KAI Oil Company during this operation." On the record here presented the expenses encountered by KAI Oil Company are all direct costs in operating the lease attributable to the period here in question.

The lessee according to his own testimony said the lease had 40 to 50 unplugged wells. Of these wells only 25 were "producing." Of necessity, the state law required the lessee to plug at least fifteen abandoned wells.

K. S. A. 55-128 provides that it is the duty of the lessee to plug the hole of any well drilled before it is abandoned. Here the lessee did not plug a single well. This court takes judicial notice (K. S. A. 60-409) of the rules and regulations of the State Corporation Commission pertaining to the plugging of wells, and also the fact that the fee for a plugging permit is $20 per well. (K. A. R. 82-2-301 to 82-2-311 inclusive.)

Certainly fifteen unplugged wells have been abandoned for all intents and purposes on the lease here in question. The cost of $20 per well for a plugging permit totals $300. This is an expense attributable to the operation of the lease for the period here involved because the lessee was obligated by statute to incur that expense. The lessee cannot take advantage of a breach of his statutory duty by failing to plug abandoned wells and assert he had no expense.

Furthermore, K. S. A. 55-132a requires the lessee to restore the surface around abandoned wells within six months. No expense need be attributed to this item, but had the lessee done what he

was required by statute to do, the expense would obviously have been considerable.

On the basis of the foregoing it is obvious the expenses of the lessee in operating the lease, or attributable to the operation, for the period here in question far exceeds the gross income to the lessee from the sale of oil produced.

For the reasons heretofore stated the lease in question expired by its own terms prior to May 31, 1973.

We hasten to add our opinion should not be construed as requiring an eighteen month period of unprofitable operation to terminate an oil and gas lease under the "thereafter" clause of the lease, which provides that the continuation of the lease be dependent upon the production of oil in paying quantities. The time factor in the formula heretofore discussed is a question we leave open.

The appellant contends the lessee's act of disconnecting pumping wells from their source of electricity was tantamount to the abandonment of production. (Citing *Collins v. Oil & Gas Co.*, 85 Kan. 483, 118 Pac. 54.) The appellee by motion has called our attention to the fact that this point was not assigned as error pursuant to the requirement of K. S. A. 1975 Supp. 60-2701 (Rule No. 6 [*d*]). This point, having been asserted for the first time in the appellant's brief, must be stricken. Under the circumstances we shall decline to consider this point and leave the question open.

For the reasons heretofore stated the trial court erred in the theory upon which it determined the case. On the record presented the judgment should be reversed, the lease having expired by its own terms for failure to produce oil in paying quantities as required by the term clause of the lease. (K. S. A. 60-2105.)

The judgment of the lower court is reversed with directions to try the remaining issues in the case.